Filed 8/31/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S095868 |
| v. | ) | |
| | ) | |
| DAVID SCOTT DANIELS, | ) | |
| | ) | Sacramento County |
| Defendant and Appellant. | ) | Super. Ct. No. 99F10432 |
| _____ | ) | |

**THE COURT.**[*]

On January 8, 2000, defendant David Scott Daniels pleaded guilty to 11 counts of robbery (Pen. Code, § 211; all undesignated statutory references are to the Penal Code), one count of carjacking (§ 215, subd. (a)), and one count of vehicle theft (Veh. Code, § 10851). He admitted enhancements for the personal use of a firearm (former § 12022.53, subd. (b)) as to the robbery and carjacking counts, and further admitted that he had suffered two prior strike convictions within the meaning of the "Three Strikes Law" (§§ 667, subds. (b)–(i), 1170.12).

On January 19, 2001, Daniels was convicted by court trial of the first degree murder of LeWayne Carolina (§§ 187, 189); the second degree murder of LaTanya McCoy (§ 187); deliberate and premeditated attempted murder of

---

[*] Cantil-Sakauye, C. J., Werdegar, J., Chin, J., Corrigan, J., Liu, J., Cuéllar, J., and Kruger, J.

SEE SEPARATE OPINIONS.

Tamarra Hillian (§§ 664, 187); attempted robbery (§§ 664, 211); first degree robbery (§ 211); residential burglary (§ 459); and evading arrest causing serious bodily injury (Veh. Code, § 2800.3). The court found true special-circumstance allegations that the murder of LeWayne Carolina occurred while Daniels was engaged in the commission of robbery and burglary (§ 190.2, subd. (a)(17)), and found true a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)). It also found true various allegations for personally discharging a firearm causing great bodily injury (former § 12022.53, subd. (d)), personally using a firearm (former § 12022.53, subd. (b)), and personally inflicting great bodily injury (former § 12022.7, subd. (a)).

On January 31, 2001, the court imposed the death penalty and an indeterminate term of life without the possibility of parole for 45 years, consecutive to an indeterminate sentence of 441 years to life, to be served consecutively following a determinate term of 125 years. The court subsequently heard and denied Daniels's automatic application for a new trial and modification of death sentence. This appeal is automatic. (§ 1239, subd. (b).)

Based on the opinions that follow, the judgment of death is reversed because Daniels's waiver of his right to jury trial on penalty was invalid. The sentence of death in connection with the conviction of second degree murder (count 21) is vacated as unauthorized, and the superior court is directed to issue an amended judgment as to this conviction reflecting the appropriate sentence of 15 years to life. The judgment in all other respects is affirmed, including the judgment of guilt as to all counts tried, the true findings of special circumstances, and all convictions entered by way of guilty plea. The case is remanded for further proceedings not inconsistent with this opinion.

The lead opinion of Justice Cuéllar, joined by Justice Werdegar and Justice Liu, expresses the opinion of the entire court on all issues except part II.D

2

(Knowing and Intelligent Waiver of the Right to Jury Trial). Justice Liu writes a concurrence to the lead opinion, which Justice Cuéllar signs. Justice Corrigan dissents from part II.D of the lead opinion in an opinion joined by Chief Justice Cantil-Sakauye and Justice Chin. Justice Kruger issues an opinion concurring in part with, and dissenting in part from, part II.D of the lead opinion.

**LEAD OPINION BY CUÉLLAR, J., CONCURRING AND DISSENTING IN THE JUDGMENT OF THE COURT**

The jury lies at the heart of California's criminal justice system and its capital sentencing scheme. Despite the costs and practical burdens associated with juries, the federal Constitution requires safeguards "[t]o protect against inappropriate incursions" on a defendant's exercise or waiver of the fundamental right to a trial by a jury of his or her peers. (*People v. Collins* (2001) 26 Cal.4th 297, 307 (*Collins*).) Our state Constitution proclaims that "[t]rial by jury is an inviolate right and shall be secured to all." (Cal. Const., art. I, § 16.) And California statutes afford capital defendants the right to a jury trial not only with respect to adjudication of guilt or innocence, but also with respect to determinations regarding special circumstance allegations and the decision to impose the death penalty. (See Pen. Code, § 190.4, subds. (a), (b); all further unmarked statutory references are to the Penal Code.)

A criminal defendant is permitted to waive his or her jury trial rights — but only if the record demonstrates the waivers are express, voluntary, knowing, and intelligent. (*Collins*, *supra*, 26 Cal.4th at p. 305.) That proves to be a problem in this case. We, the undersigned, cannot conclude that defendant David Scott Daniels's waivers of jury trial were knowing and intelligent, in compliance with constitutional requirements. That this error results in unquantifiable prejudice is the reason we would reverse Daniels's guilt convictions, the true findings of

special circumstances, and the penalty of death. Our view on this issue, however, does not today command a majority of the court. Thus, we concur in the court's reversal of the penalty of death, while we dissent from the judgment to affirm Daniels's trial convictions and special-circumstance findings.

Because the court reverses the judgment of death, we need not address Daniels's claims challenging specific aspects of his trial relating to his death sentence, or California's death penalty scheme more generally. We analyze Daniels's remaining claims only to the extent they seek to attack his convictions or the special-circumstance determinations. With the exception of Daniels's claim maintaining that his jury trial waiver was invalid, discussed in part II.D, the court unanimously agrees with the reasoning and resolution of Daniels's claims examined below.

# I. FACTS

## A. Guilt Phase Evidence

The People presented the following evidence during the guilt phase of trial. Daniels did not present any guilt phase evidence or argument.

### 1. Armed Robberies and Carjacking

From November 26 through December 27, 1999, Daniels committed several armed robberies of businesses in Sacramento. The robberies proceeded in substantially the same fashion: Daniels would enter a bank or store, pull out a firearm or insinuate that he had a firearm, and demand money from the cash register. On one occasion, Daniels led a customer and a clerk to the back of the store, took $25 from the customer's wallet, and bound the customer's and clerk's necks and faces with cable wire before taking $1,000 dollars from the store's cash register.

2

On January 1, 2000, Daniels approached Gabriel Tover and Lisa Lovado outside a Blockbuster Video in Stockton, holding what looked to be a machine gun or an Uzi. Daniels pointed his firearm at Tover and demanded the keys to a silver 1995 Chevrolet Camaro; Tover obliged. After also taking Lovado's purse and Tover's wallet, Daniels got into the car and drove off.

In connection with these and similar incidents, Daniels pleaded guilty on January 8, 2001, to 11 counts of armed robbery with use of a firearm, one count of carjacking with use of a firearm, and one count of vehicle theft. In addition, Daniels admitted he had suffered two prior strike convictions within the meaning of the Three Strikes Law (§§ 667, subds. (b)–(i), 1170.12).

### 2. *LeWayne Carolina Homicide*

Jennifer O'Neal and Daniels were dating and had known each other about four years. At approximately 6:30 p.m. on December 28, 1999, Daniels picked up O'Neal and O'Neal's eight-year-old daughter in his car. O'Neal noticed that Daniels had, under his clothing, a Tec-9 firearm tied around his neck with a shoelace. Daniels told O'Neal he needed the firearm for protection, explaining that he was "on the run" and not going back to prison.

Around 8:00 p.m., Daniels, O'Neal, and O'Neal's daughter went to the Ramada Inn on Auburn Boulevard, where O'Neal rented a room. Daniels made a phone call in the lobby, as well as some calls in the hotel room. Daniels smoked three cocaine cigarettes between approximately 8:00 and 9:30 p.m. Daniels, O'Neal, and O'Neal's daughter left the hotel together by car.

They picked up a woman named Marcie, then drove to Martina Daniels's house in South Sacramento where they picked up Martina and her friend Lamar. Lamar recommended a place where Daniels could buy illegal drugs. Daniels drove the car and its passengers to an apartment complex on Mack Road. He

3

seemed "very high" and "very hyper." His driving was "okay, a little fast, but he was driving normally." When they arrived at the Stonegate apartment complex, Daniels indicated he would be right back, and both he and Lamar exited the car. O'Neal described Daniels's demeanor as "very aggressive" and observed that "he was not in a normal state of mind. He was not rationally thinking." Martina, Marcie, O'Neal, and O'Neal's daughter waited in the car.

Around 9:00 p.m. that same evening, Tamarra Hillian arrived to visit Ray Jedkins, a friend of hers from high school, at Jedkins's apartment. Jedkins's cousin, LeWayne Carolina, was also at the apartment. As Hillian sat in the apartment living room watching television, there was a knock at the door. Jedkins answered the door and spoke with Daniels, who was standing outside, for "a little while" before Jedkins let Daniels inside. Daniels and Jedkins walked into the kitchen and chatted with Carolina before Jedkins returned to the living room. A few minutes later, Daniels walked into the living room and demanded money while pointing a large firearm in Jedkins's direction. Jedkins handed Daniels a wad of money from his pocket. Then, Hillian heard gunshots and covered her face. Jedkins climbed out the living room window. After the gunshots stopped, Daniels ran out of the apartment. Hillian never saw Daniels point the gun at her or Carolina.

After Daniels fled the apartment, Hillian tried to stand up, but her leg crumpled and she fell to the floor. She had been shot in the hand and in the leg. She crawled to the kitchen telephone and saw that Carolina had been fatally shot. As Hillian attempted to dial for help, Jedkins returned to the apartment and called 911. Sacramento police officers later arrived at the Stonegate apartment complex and collected nine-millimeter and .380 bullet casings from the scene. Forensic pathologist Dr. Gregory Reiber, who performed the autopsy of Carolina, testified that Carolina suffered a fatal gunshot wound to the head and a superficial graze

4

wound on the left side of his back.  No soot or gunpowder was found on Carolina's head, indicating that the fatal gunshot was fired from a distance greater than 12 to 18 inches.

About 10 minutes after the group had arrived at the apartment complex, Lamar returned alone to the car.  He appeared scared and looked as though he was praying.  Daniels returned to the car soon after, holding his left side and gasping for air.  Daniels told O'Neal, "I've been shot.  That guy shot me."  Daniels drove the car away from the apartment complex and back to Martina's house, swerving while appearing to nod off.  At Martina's house, O'Neal and the other adults attempted to treat Daniels's bullet wounds on his left arm and left side near his back.  Martina saw that Daniels had a gun, one she would identify in court as similar to the nine-millimeter gun found on Daniels at his arrest.

Martina drove Daniels, O'Neal, and O'Neal's daughter back to the Ramada Inn.  In the hotel room, Daniels told O'Neal that there were three other men and a woman in the Stonegate apartment.  He said a man in the kitchen started shooting, and Daniels had returned fire.  Daniels told O'Neal he shot the woman, who had been yelling, and also shot the man sitting on the couch.  He said "he would not be taken alive" by law enforcement.  While relaying his account of events, Daniels smoked a cocaine cigarette.  Martina observed a smaller gun on the dresser, which Daniels explained he got from the man who shot him in the apartment.

### 3. *LaTanya McCoy Homicide*

On December 30, 1999, local law enforcement authorities issued an arrest warrant for Daniels for the murder of LeWayne Carolina.  On the morning of January 2, 2000, Sacramento Police Detective Michael Kaye was conducting surveillance in front of Martina's house.  Around 6:00 a.m., Daniels drove a silver Chevrolet Camaro down the street, making unusual maneuvers before he paused in

5

front of the residence.  When the Camaro pulled away, Kaye followed in pursuit. Kaye broadcasted the Camaro's direction of travel to responding patrol units.

Officer Shaunda Davis of the Sacramento Police Department was on patrol, positioned on a nearby road.  She activated the patrol car's overhead lights, as did officers in another patrol car, in anticipation of a felony vehicle stop.  Daniels initially pulled over, but then drove off at a high speed before the officers could position themselves for a vehicle stop.  Fog limited visibility.  Police dispatchers were advised that Daniels's car was traveling on Mack Road at speeds up to 100 miles per hour.  Daniels's car weaved in and out of traffic.  After passing the intersection of Mack Road and Franklin Boulevard, Daniels's Camaro collided with another car at a minimum of 80 miles per hour.  The other car spun across the embankment that divided the roadway and burst into flames.  Davis unsuccessfully attempted to remove the driver, LaTanya McCoy, from the burning car.  The fire killed McCoy and burned her entire body.

The Camaro veered off the road and eventually stopped.  Shortly thereafter, several Sacramento City police officers arrived at the scene.  Officer Brian Ellis advised Daniels to put up his hands outside of the vehicle.  Daniels raised his left hand but claimed his right hand was stuck.  As Sergeant Steven Weinrich reached into the Camaro to extract Daniels, Daniels fired his Tec-9 firearm.  Weinrich returned fire and was shot as he retreated behind the car.  One bullet was later found lodged in Weinrich's bulletproof vest, while another bullet entered his upper thigh.

## B.  Penalty Phase Evidence

### 1.  *Prior Statements by Daniels*

The penalty trial commenced on January 23, 2001.  The prosecution began its case by introducing statements made by Daniels on January 19, 2000, in which

6

he threatened officers while hospitalized in the surgical intensive care unit. The prosecutor argued that these statements constituted an uncharged violation of section 69 (obstructing or resisting an officer by means of threat or violence).

Sacramento County Sheriff's deputies testified regarding two confiscated letters written by Daniels while in jail in April and June of 2000. In one six-page letter addressed to a woman named Nikki, Daniels stated that he felt responsible for McCoy's death and wished that he had died instead of McCoy. He also wished he had "killed every last one" of the police officers he shot. Daniels wrote he was not afraid to die and preferred death to life in prison. He stated he knew he would get caught and "that's why [he] robbed every bank an [*sic*] store in sight." Included with an 11-page letter from Daniels to his aunt was a printout labeled "Daniels Investigation Time Line," which contained admissions and details of crimes committed between November 16, 1999, and January 1, 2000. The listed offenses included 6 bank robberies, 17 robberies, 2 carjackings, and a shootout with the Turlock Police Department.

### 2. *Prior Convictions*

During the guilt phase, Daniels admitted to two prior felony convictions: a January 1986 felony conviction for attempted first degree burglary (§§ 664, 459) and a July 1991 felony robbery conviction (§ 212.5). Daniels understood that those prior pleas could be relevant, admissible evidence for penalty purposes.

At the penalty phase, the prosecution introduced certified copies of three prior convictions: a March 1988 felony conviction for possession of a controlled substance (Health & Saf. Code, § 11350); an October 1990 felony conviction for sale of a controlled substance (Health & Saf. Code, § 11352); and a February 1998 felony conviction for second degree burglary (§ 459). Daniels acknowledged he had seen copies of these prior convictions.

7

### 3. Uncharged Crimes

The prosecution introduced evidence of several uncharged crimes that occurred in December 1999. Specifically, the prosecution elicited a bank teller's testimony regarding Daniels's armed robbery of the Washington Mutual Bank in Stockton on December 11, 1999, and his departure from the bank with about $6,000 in stolen cash. In addition, business proprietor Vorn Chan and his daughter Junda Chan testified about an armed robbery of Lim's Market in Stockton on December 22, 1999, during which a man took money from the cash register and Vorn's personal effects before driving off in a Toyota pickup owned by Vorn's son-in-law. Neither Vorn nor Junda identified Daniels as the perpetrator of the robbery, but Daniels indicated that he committed a crime at Lim's Market in the printout he had included in the letter to his aunt.

Witnesses testified that on December 30, 1999, Daniels was driving with an unidentified female on the J14 highway in Merced County. After driving off the roadway at a high speed, he exited his car in a daze and appeared "really loopy" and "spaced out." Shantel Little stopped to help. After Daniels approached her with a firearm, Little exited her white Camaro. Daniels and his female passenger entered the Camaro and drove away.

Deputy Sheriff Mark Goddard, who was advised by dispatch of the carjacking, observed Daniels in the Camaro and pulled him over. But once Goddard pulled in from behind, Daniels took off, weaving through traffic at speeds up to 80 miles per hour. Officers from the Turlock Police Department pursued the Camaro until Daniels collided with another car while driving 55 to 60 miles per hour. Daniels got out of the Camaro and fired approximately four to six gunshot rounds at the officers. He then fled on foot while the injured female passenger was arrested. Officers collected discharged shell casings from the scene and later concluded that the casings had been fired from Daniels's Tec-9 firearm.

8

Jose Campos testified that on the evening of December 30, 1999, Daniels walked into the garage of Campos's home in Turlock with a firearm and asked Campos for his car keys. Campos retrieved his keys from within the house, gave them to Daniels, and returned to his house. When Campos reentered the garage, his car was gone.

### 4. *Statement of Apology*

Daniels declined to present evidence or deliver a closing argument during the penalty phase trial. He did, however, offer a lengthy apology — expressing deep remorse and sadness — to the Carolina and McCoy families. Daniels stated that he had "no intention on doing anything" to Carolina. He spoke of being a father to four boys, and apologized in particular to Carolina's father. He "accept[ed] some responsibility for that accident" that killed McCoy. The chance to apologize to the families, he said, "means a lot to me, and I have to live with this for the rest of my life." He also noted that "it took a long time for me to really prepare myself to say this" to the family members. The court would later identify Daniels's statement as potentially mitigating evidence, stating, "During the penalty phase, Mr. Daniels addressed the families of the victims. At that time, Mr. Daniels did express some remorse for his actions and took some responsibility for the crimes. These facts may constitute a mitigating factor."

## II. DISCUSSION

### A. Knowing and Intelligent Waiver of the Right to Counsel

Daniels contends that the record does not reflect a valid waiver of the right to counsel. To wit, he argues that the court did not adequately advise him of the complexities of a capital trial, made no meaningful inquiry into his understanding of the charges and possible defenses, and ignored his comment that he did not view self-representation as a disadvantage. We reject this claim.

9

*1. Background*

At a court proceeding on April 28, 2000, Daniels asked to speak to the judge. Judge Ransom told Daniels that he had to speak through his lawyer. Daniels responded, "I'm not agreeing with nothing that's going on. I'm not agreeing with nothing that's going on here — I'm not agreeing with nothing that's going on here." The proceeding terminated without further discussion.

In a letter dated December 7, 2000, Daniels advised the court, "I am Respectfully Requesting that I be allowed to withdraw my 'Not Guilty' Plea and enter a 'Guilty Plea.' I am also Requesting that I Be allowed to Represent myself, my feretta [*sic*] Rights. I fully understand that I am charged with the Capitol [*sic*] offense of Murder penal code Section 187 with the special circumstances."

About two weeks later, on December 20, 2000, Judge Ransom engaged Daniels in a colloquy regarding the benefits of counsel and the drawbacks of self-representation. In response to the court's questioning, Daniels indicated that he knew he had the right to counsel at all stages of the case, he understood that self-representation is "generally not a wise choice" in criminal matters, and he would face the death penalty if convicted. Further, Daniels acknowledged that the court would not help him present his case or grant him special treatment, he was being opposed by a trained prosecutor, he would be required to comply with all rules of criminal procedure and evidence, he would forfeit a potential ineffective assistance of counsel claim on appeal, he would be removed from the courtroom if he were disruptive, and he had a right to hire his own attorney at any time but the court would not delay proceedings to accommodate attorney preparation. In response to the court's questioning, Daniels informed the court that he had a high school education and could read and write. He then stated, "I want to exercise my Faretta" and reiterated his wish to represent himself. The court then expressed that it was "satisfied he's doing this knowingly and intelligently," and granted the

10

motion for self-representation. Later that day, Daniels signed a "Record of Faretta Warnings" form, acknowledging that he had been personally advised of various rights which had been discussed during the oral colloquy. Daniels rejected the court's offer to appoint advisory counsel.

The case was subsequently assigned, for all purposes, to Judge Long. At the outset of proceedings on January 5, 2001, Judge Long confirmed that Daniels was representing himself and that Judge Ransom had advised him of the pitfalls of self-representation. Daniels then acknowledged that he had received the amended information in this case. Thereafter, Judge Long arraigned Daniels on the amended information, reading aloud each of the 22 charges and the sentencing enhancements. After reading each charge, the court asked, "Do you understand the charges?" Daniels responded affirmatively as to each charge. While arraigning Daniels on counts 12 and 21, the special-circumstance murder counts, Judge Long informed him that these were serious felonies. The court explained that, as to these charges, if Daniels were found guilty of these charges, the case would proceed to a penalty phase where the People would seek the death penalty. Daniels said he understood. After the court finished reading all the charges, the following colloquy transpired:

"THE COURT: Sir, did you understand all those charges?

"MR. DANIELS: Yes, sir.

"THE COURT: Are there any questions you need to ask me relating solely to the nature of the charges that the People of the State of California have filed against you?

"MR. DANIELS: No, sir."

Thereafter, by asking a series of yes or no questions, Judge Long warned Daniels about the dangers of self-representation. Despite the fact that the judge informed Daniels that the prosecutor in this case was "one of the experts in this

11

county in prosecuting" death penalty cases, Daniels expressed his desire to continue self-representation. During this colloquy, the following exchange occurred:

"THE COURT: You understand that these are very, very serious matters and that whatever your legal training is and I don't know what it is, I'm going to get into that, that you, sir, are placing yourself at a severe disadvantage? Do you understand that?

"MR. DANIELS: Yes, your Honor. I don't look at it as a disadvantage.

"THE COURT: You do not look at it as a disadvantage?

"MR. DANIELS: No.

"THE COURT: All right. . . ."

Judge Long reminded Daniels that he would be held to the standards of a lawyer, the court could not assist him in any way, the consequences of self-representation were "enormous" in this case, it is "never wise" for an unskilled person to represent himself, and that "it is said that he who represents himself is a fool." Judge Long asked Daniels if he understood that "it could get so bad in here based upon your lack of skill and you may have skill, that if this were a professional [sporting] event in the legal sense, it might be like a flag football team going up against the Tennessee Titans?" Daniels responded, "I hear you." Daniels stated he understood that he would not be able to raise the issue of counsel's competence on appeal.

As part of his analysis of Daniels's decision to exercise his right to self-representation, Judge Long made several inquiries about Daniels's mental state that day. Daniels responded that he was thinking clearly, he knew what he was doing, he was taking Neurontin for nerve damage in his hand but the medication was not interfering with his choice to represent himself, and that he was not under the effect of any substance that would cloud his judgment. In response to the

12

court's questioning, Daniels stated that he was 33 years old, could read and write, had graduated from high school, and had been employed "off and on" as a mailroom clerk — a job which required reading and understanding documents. He also stated that no threats had been made against him or his family members in connection with his decision, nor had he been subject to any force or pressure influencing him to represent himself. When the court asked Daniels to state, in his own words, the potential penalty he would be facing if found guilty and the special circumstances found true, Daniels replied, "I could be put to death." This exchange followed:

"THE COURT: Are there other areas that you think I need to explore at this time? Oh, and further, if you did want a lawyer, do you understand that I would appoint a lawyer for you and give you what additional time you need to prepare for this trial? Do you understand that?

"MR. DANIELS: Yes, I do.

"THE COURT: And even with that offer, you still want to represent yourself and proceed to trial?

"MR. DANIELS: Yes, your Honor."

Daniels again declined advisory counsel. Following a 15-minute recess for Daniels to reflect on his decision, the court concluded its advisements and ruled on Daniels's *Faretta* motion:

"THE COURT: All right. We are again on the record. Mr. Daniels, have you had an opportunity to think about, you know, the colloquy we have gone through relative to you representing yourself?

"MR. DANIELS: Yes.

"THE COURT: Now, let me ask you this: You have told me that you understand the nature of all these charges and what could happen to you, right?

"MR. DANIELS: Yes, I understand.

13

"THE COURT:  And if you wish to present a defense, that is kind of like up to you, but if you wish to do that, your mind is clear and your thoughts and you understand the charges where if you wish to do that, you feel you could do that?

"MR. DANIELS:  Yes, I do.

"THE COURT:  You do?

"MR. DANIELS:  Yes, I do.

"THE COURT:  All right.  Is there anything else?

"[THE PROSECUTOR]:  No, your Honor, not on that issue.

"THE COURT:  All right.  The Court makes findings as follows:  One, the defendant, Mr. Daniels, is competent, he understands the nature of the charges, he understands and represents that his mind is clear whereby if he wished to present a defense, he would know how to do that to these charges.  [¶]  The Court also finds that Mr. Daniels understands and is aware of the risk and dangers of representing himself, and I further find that he is waiving his right to a lawyer and proceeding to trial by way of self-representation.  And I find that this choice for him to represent himself is done knowingly, freely, and intelligently, and without any force or coercion.  The Court then will grant you your right to represent yourself."

Daniels signed a record of *Faretta* warnings in open court and affirmed that he understood the warnings contained in the document.

### 2. *Analysis*

Daniels argues the court failed to meaningfully inquire into his understanding of the charges.  The record contains no indication that Daniels ever discussed the risks of self-representation with counsel.  Daniels asserts that neither Judge Ransom nor Judge Long inquired as to Daniels's legal experience or informed him of the complexities of trial.  Further, Judge Long did not address Daniels's statement that he did not view self-representation to be disadvantageous.

14

As established by the high court in *Faretta*, a defendant has a federal constitutional right to the assistance of counsel during all critical stages of a criminal prosecution. (*Faretta v. California* (1975) 422 U.S. 806, 807 (*Faretta*); *United States v. Wade* (1967) 388 U.S. 218, 223–227.) A defendant may nonetheless waive this right and personally represent himself or herself, as long as the defendant's waiver of the right to counsel is valid. An effective waiver requires that the defendant possess the mental capacity to comprehend the nature and object of the proceedings against him or her, and waive the right knowingly and voluntarily. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069 (*Koontz*); *Godinez v. Moran* (1993) 509 U.S. 389, 401, fn. 12.) There is no prescribed script or admonition that trial courts must use to warn a defendant of the perils of self-representation. But the record as a whole must establish that the defendant understood the "dangers and disadvantages" of waiving the right to counsel, including the risks and intricacies of the case. (*People v. Blair* (2005) 36 Cal.4th 686, 708; *People v. Burgener* (2009) 46 Cal.4th 231, 241.) If a defendant validly waives the right to counsel, a trial court must grant the request for self-representation. (*People v. Welch* (1999) 20 Cal.4th 701, 729.) We review a *Faretta* waiver de novo, examining the entire record to determine the validity of a defendant's waiver. (*Koontz*, at p. 1070.)

In determining the validity of a trial court's decision to permit the exercise of a defendant's *Faretta* right, we have treated the suggested advisements and inquiries set forth in *People v. Lopez* (1977) 71 Cal.App.3d 568 (*Lopez*) as a useful reference for courts to ensure the knowing and voluntary waiver of counsel. (*Koontz*, *supra*, 27 Cal.4th at pp. 1070–1073.) *Lopez* suggests the court provide advisements falling into three general categories: (1) ensuring the defendant's awareness of the " 'dangers and disadvantages' " associated with self-representation; (2) inquiring into the defendant's intellectual capacity; and (3)

15

informing the defendant that he or she cannot later claim inadequacy of representation. (*Lopez*, at pp. 572–574.) Here, the record demonstrates that Daniels was — orally and in writing — sufficiently advised of the benefits of counsel and warned about the pitfalls of self-representation in accordance with *Lopez*'s guidance.

First, Daniels was made thoroughly aware of the " 'dangers and disadvantages of self-representation.' " (*Lopez*, *supra*, 71 Cal.App.3d at p. 572.) The court advised him that it is "never wise" for an unskilled person to represent oneself. The court also told him that it would not grant him any special treatment, and he would be subject to the same standards expected of an attorney. Judge Ransom and Judge Long both emphasized to Daniels that he would be opposed by a trained prosecutor, whom Judge Long described as "one of the experts in this county in prosecuting [death penalty] cases." Judge Long analogized the expected disparity in lawyering skills to "a flag football team going up against the Tennessee Titans." Daniels signed a "Record of Faretta Warnings" form, attesting that he had been advised of the court's oral admonitions — including that he had the right to counsel at all stages of the case; it is generally "not a wise choice" to represent oneself in a criminal matter; he would not receive any special treatment from the court; and he would be required to comply with all rules of criminal procedure and evidence just like an attorney would. Finally, Daniels was twice provided a form explaining his library privileges as a self-represented inmate. Daniels orally acknowledged that he had read and considered the court order regarding in propria persona privileges. The record reveals that the court amply advised Daniels of the dangers and disadvantages of self-representation.

Second, the court conducted an inquiry into Daniels's intellectual capacity, as recommended in *Lopez*. Both Judge Ransom and Judge Long asked about Daniels's education level. Daniels stated that he had a high school education and

16

could read and write. He told the court that he had previously been employed "off and on" as a mailroom clerk, a job which required that he read and understand documents. The court also ensured that Daniels was made aware of his right to counsel. (See *Lopez*, *supra*, 71 Cal.App.3d at p. 573.) Specifically, Daniels was informed of his right to appointed counsel, if he could not afford his own, throughout the entirety of proceedings. Daniels rejected the court's multiple offers to appoint advisory counsel and a defense investigator, and he later confirmed that he did not desire such assistance.

The court read aloud all 22 charges from the amended information and confirmed, after each offense, that Daniels understood the charge just read. Daniels acknowledged that he could be put to death if he were found guilty and the special circumstances found true. Daniels was informed that if he were disruptive, he would be removed from the courtroom and an attorney would be brought in to complete the case on his behalf. We reject Daniels's argument that the court's inquiry was inadequate because it did not review the elements of the charges, possible defenses, or possible punishments besides the death penalty — or confirm that counsel had done so with Daniels. Although an "exploration into . . . possible defenses and possible punishments" may be useful to help a defendant understand "just what he is getting himself into" (*Lopez*, *supra*, 71 Cal.App.3d at p. 573), it is not required for a knowing and intelligent waiver of counsel under *Faretta*. (See also *People v. Riggs* (2008) 44 Cal.4th 248, 277 ["The trial court is not required to ensure that the defendant is aware of legal concepts such as the various burdens of proof, the rules of evidence, or the fact that the pursuit of one avenue of defense might foreclose another. . . ."]; *People v. Joseph* (1983) 34 Cal.3d 936, 939–944 [less extensive colloquy in capital case revealed that waiver was knowing and intelligent, rendering denial of self-representation request reversible error].) Further, Daniels told the court that he understood the nature of

17

all the charges against him.  Daniels's waiver was not defective simply because the court did not define offense elements, such as premeditation or malice aforethought, or review potential defenses.

Despite the absence of direct questions by Judge Ransom about Daniels's mental competence, Daniels points to nothing in the record that would have raised a question about his competence.  (See *Lopez*, *supra*, 71 Cal.App.3d at p. 573 ["*If there is any question in the court's mind as to a defendant's mental capacity . . . a rather careful inquiry into that subject should be made*" (italics added)].)  Moreover, Judge Long did inquire about Daniels's present mental health and whether Daniels was "thinking clearly."  In response to questioning, Daniels indicated that he was thinking clearly, knew what he was doing, and was not under the effect of any substance that would cloud his judgment.  The court made an express finding that Daniels was competent to waive his right to counsel.  The record as a whole supports the court's conclusion.

Daniels stated that he did not view self-representation as a disadvantage.  "All right," replied the court, without asking why Daniels felt this way.  If Daniels's statement had conveyed some understanding that his waiver of counsel was conditional, the court would have been obligated to accept the condition or else deem the waiver ineffective.  (See *People v. Carter* (1967) 66 Cal.2d 666, 670 ["waiver of counsel which is made conditional by a defendant cannot be effective unless the condition is accepted by the court"].)  But Daniels's statement does not divulge a conditional waiver, such as one contingent upon the receipt of some undisclosed benefit.  In light of the court's admonitions, Daniels's statement at most reflects his personal preference to control his own defense — which, no matter how ill-advised, he was entitled to do under *Faretta*.  (See *Faretta*, *supra*, 422 U.S. at p. 834 ["the defendant . . . must be free personally to decide whether in his particular case counsel is to his advantage"].)  Accordingly, Daniels fails to

18

persuade that the court had a duty to clarify what Daniels meant, or else invalidate the waiver.

Third, Daniels was informed by both Judge Ransom and Judge Long that, if he chose to represent himself, he could not later claim inadequacy of representation. (See *Koontz*, *supra*, 27 Cal.4th at p. 1071, citing *Lopez*, *supra*, 71 Cal.App.3d at p. 574.)

Daniels also raises an argument unrelated to the sufficiency of the court's admonitions. He insists that, because his written request to represent himself was coupled with a request to plead guilty, it should have been apparent to the court that Daniels was trying to circumvent the statutory limitation on his ability to plead guilty. Daniels argues that the court should have sua sponte appointed additional counsel or determined whether Daniels was able to negotiate a plea that would not have subjected him to the death penalty. We are not aware of any binding authority — nor has Daniels identified any — that would have required the court to take such action. There is no dispute that Daniels's express waiver of counsel was voluntary. Considering the record as a whole, we conclude that Daniels's counsel waiver was also knowing and intelligent, and therefore valid.

## B. Self-Representation in Violation of Section 1018 and the Eighth and Fourteenth Amendments

Representing himself, Daniels expressly waived the right to a trial by jury. At trial, he did not present any evidence or argument, did not raise any objections, and did not conduct cross-examination. Daniels argues that his actions at trial were tantamount to a guilty plea in violation of section 1018, and that the proceedings were insufficiently reliable so as to violate the Eighth and Fourteenth Amendments to the United States Constitution. He seeks reversal of the murder convictions and the special-circumstance findings. For reasons elucidated below, this claim is one we reject.

## 1. Background

At a court appearance on April 28, 2000, Daniels asked to speak with the judge.  Judge Ransom informed Daniels that he would need to speak through his lawyer.  In response, Daniels stated, "I'm not agreeing with nothing that's going on.  I'm not agreeing with nothing that's going on here — I'm not agreeing with nothing that's going on here."

On August 7, 2000, at a proceeding to set a date for Daniels's preliminary hearing, Daniels told Judge Ransom that he wished to plead guilty.  Daniels's counsel confirmed that Daniels was facing the death penalty for these charges.  The court informed Daniels that he was not permitted to plead guilty without his counsel's consent; the court then entered Daniels's plea of not guilty.

On August 23, 2000, in response to the court's request that Daniels waive his right to a continuous preliminary hearing so that the court could start later the next day, Daniels told the court, "[I'm] willing to waive all my rights . . . and go no further in the matter."  The next day, after Daniels was held to answer, he repeated his desire to plead guilty.  The court asked counsel if, "in light of the seriousness of the offense," he wished to enter pleas of not guilty and denials of enhancements on behalf of Daniels; counsel replied in the affirmative.  At Daniels's arraignment a week later, the court refused Daniels's request to address the court in private after the court asked Daniels whether he wanted counsel.

In a letter dated December 7, 2000, Daniels wrote to Judge Ransom:  "I am Respectfully Requesting that I be allowed to withdraw my 'Not Guilty' Plea and enter a 'Guilty Plea.'  I am also Requesting that I Be allowed to Represent myself, my feretta [*sic*] Rights.  I fully understand that I am charged with the Capitol [*sic*] offense of Murder penal code Section 187 with the special circumstances."  He enclosed a partially completed fill-in-the-blank *Faretta* motion form.  On December 20, 2000, the court granted Daniels's request to represent himself,

20

though it advised Daniels that, even if he was self-represented, he could not "plead guilty to a death penalty case and get the death penalty."

The case was reassigned from Judge Ransom to Judge Long for all purposes on January 5, 2001. Despite Judge Ransom's prior admonition, Daniels again attempted to plead guilty to all charges. The court prohibited Daniels from pleading guilty to the murders and related counts (counts 12–16, 20–22), but allowed him to enter guilty pleas to all other counts that had not been dismissed. Daniels waived his right to a jury trial and agreed to have Judge Long decide guilt and penalty. At trial, which lasted two days, the prosecution presented the testimony of 27 witnesses and entered 90 exhibits in evidence. Daniels asked no questions of any witness, raised no objections, presented no witnesses or evidence, and made no argument in his defense.

On review, Daniels argues that — by waiving counsel and jury trial and then failing to present any defense — he effectively pleaded guilty without consent of counsel, in violation of section 1018. He contends that because his conviction obtained in violation of section 1018, it must be reversed. Moreover, Daniels asserts that reversal is warranted because the proceedings below lacked the reliability required by the Eighth and Fourteenth Amendments.

    *2. Analysis*

Section 1018 provides, in relevant part: "No plea of guilty of a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall that plea be received without the consent of the defendant's counsel." In 1973, the Legislature amended the statute to add the requirement that defense counsel consent to a guilty plea in capital cases. (Stats. 1973, ch. 719, § 11, p. 1301.) We have recognized this amendment to be a component in an

21

overhaul of California's death penalty laws, following the high court's decision in *Furman v. Georgia* (1972) 408 U.S. 238, in an effort to eliminate arbitrariness in the imposition of the death penalty. (See *People v. Chadd* (1981) 28 Cal.3d 739, 750 (*Chadd*).) The consent of counsel requirement is rooted "in the state's strong interest in reducing the risk of mistaken judgments in capital cases and thereby maintaining the accuracy and fairness of its criminal proceedings." (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1300 (*Alfaro*).)

Daniels informed the court several times, during various pretrial proceedings, that he wished to plead guilty to all charges, but the court told him that he could not do so under section 1018. After counsel refused to consent to his pleading guilty, Daniels waived counsel and opted to represent himself. Even thereafter, the court did not permit Daniels to plead guilty to the murder charges or related counts; those charges thus proceeded to trial.[1] Daniels argues that his own inaction at trial — his failure to cross-examine any prosecution witnesses, raise objections, and present evidence and argument in his defense — was tantamount to a "slow plea of guilty" in violation of section 1018.

A "slow plea" is an " 'agreed-upon disposition . . . which does not require the defendant to admit guilt but results in a finding of guilt . . . usually, for a promised punishment.' " (*People v. Wright* (1987) 43 Cal.3d 487, 496, quoting *People v. Tran* (1984) 152 Cal.App.3d 680, 683, fn. 2.) One of the clearest examples of a slow plea is "a bargained-for submission on the transcript of a preliminary hearing in which the only evidence is the victim's credible testimony,

---

[1] "Even if otherwise competent to exercise the constitutional right to self-representation [citation], a defendant may not discharge his lawyer in order to enter such a plea [of guilty to a capital felony] over counsel's objection." (*People v. Mai* (2013) 57 Cal.4th 986, 1055.)

and the defendant does not testify and counsel presents no evidence or argument on defendant's behalf." (*Wright*, at p. 496.) Where the agreed-upon procedures become tantamount to a guilty plea, a court commits reversible error if it fails to secure the constitutional and statutory safeguards entailed by a plea. (See *Tran*, at pp. 684–685.) For the purpose of addressing this claim, we assume — but do not decide — that a "slow plea" qualifies as a "plea" within the meaning of section 1018.

Daniels argues that the "truncated, non-adversarial proceedings" of this case do not advance section 1018's constitutional and policy purposes of ensuring reliable judgments in capital cases. But a trial, even one where a defense is voluntarily forgone, is fundamentally different from a guilty plea. In the proceedings below, the state was put to its burden of proof as to the murder charges and related counts. A plea, on the other hand, "serves as a stipulation that the People need introduce no proof whatever to support the accusation" and " 'is itself a conviction.' " (*Chadd*, *supra*, 28 Cal.3d at p. 748.) Moreover, a guilty plea severely limits the right to appeal. (See *ibid.*) Section 1018 is reflective of the state's interest in reducing the risk of mistaken judgments, an interest that is particularly pronounced in the context of guilty pleas. (See *id.* at pp. 751–753.)

A submission "is defined by the rights a defendant surrenders." (*People v. Robertson* (1989) 48 Cal.3d 18, 40.) The essential components of a submission amounting to a slow plea are the waiver of trial by jury, the waiver of the right to confront witnesses, and the waiver of the privilege against self-incrimination. (*See id.* at pp. 39–40; see also *Chadd*, *supra*, 28 Cal.3d at p. 748 [one of the consequences of a guilty plea is that it "strips the defendant of . . . the privilege against self-incrimination, the right to a jury, and the right of confrontation"].) Here, there is no indication that Daniels's waiver of jury trial was the consequence of any negotiated agreement concerning the disposition, punishment, or evidence

23

to be presented in the case. Further, Daniels never surrendered his right to confront witnesses or otherwise challenge the prosecution's evidence at trial; he simply elected not to do so. He also preserved his privilege against self-incrimination by declining to testify throughout trial.

In addressing Daniels's argument regarding the nature of proceedings in his case, we find instructive *People v. Sanders* (1990) 51 Cal.3d 471. There, the defendant, who was represented by counsel, claimed that his decision not to present evidence at the penalty phase of trial was tantamount to a guilty plea in violation of section 1018. (*Id.* at p. 527.) We rejected this argument, finding that section 1018 did not govern, in part because the defendant's "choice did not amount to an admission that he believed death was the appropriate penalty, nor did he give up his right to confront or cross-examine those testifying against him at the penalty phase." (*Ibid.*) We found section 1018's scope not so broad as to encompass the defendant's choice to not participate in his trial. (*Ibid.*)

Daniels's argument does not persuade us that the trial court should have appointed counsel after realizing that Daniels intended to forgo presentation of any trial defense. In affirming the Sixth Amendment's right of self-representation upon a knowing and intelligent waiver of the right to counsel, the high court stated, "The right to defend is personal. . . . [A]lthough [the defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' [Citation.]" (*Faretta*, *supra*, 422 U.S. at p. 834.) We have held that "a capital defendant representing himself under *Faretta* has no duty to 'present a defense' but may simply 'put the state to its proof.' " (*Chadd*, *supra*, 28 Cal.3d at p. 750, fn. 7, quoting *People v. Teron* (1979) 23 Cal.3d 103, 115.)

Daniels is correct to emphasize the significance of section 1018's prohibition against guilty pleas in capital cases. But his refusal to participate in

24

his defense at trial did not amount to a slow plea in violation of section 1018. Further, we reject his related claims that the nonadversarial nature of the proceedings below rendered the judgment unreliable in violation of the Eighth and Fourteenth Amendments to the United States Constitution. "[T]he high court has never suggested that this heightened concern for reliability requires or justifies forcing an unwilling defendant to accept representation or to present an affirmative penalty defense in a capital case." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1228 (*Bloom*).) Indeed, such a requirement — which hinges solely on a defendant's behavior — would produce perverse incentives, encouraging defendants who wish to avoid the death penalty to decline to present any defense, knowing that their sentence will be reversed on appeal. (See *id.* at p. 1227.) In the instant case, the prosecution discharged its burden of proof during the guilt and special-circumstance phases. The judgment does not violate the reliability requirements of the Eighth and Fourteenth Amendments.

### C. Waiver of Counsel in Violation of Section 686.1

Daniels also contends the trial court erred under section 686.1 by failing to deny Daniels's *Faretta* motion. When Daniels's waiver of counsel was accepted, he had already expressed to the court his desire to plead guilty to all charges and had repeatedly declined advisory counsel and an investigator. Daniels argues that his passivity throughout the proceedings undermined the fairness and reliability of the judgment, such that his right to self-representation should have been subordinated or revoked based on recognized limits of the high court's *Faretta* decision and Eighth Amendment reliability requirements in capital cases.

Section 686.1 requires defendants in capital cases to be represented by counsel during all stages of the preliminary and trial proceedings. This provision predates the high court's decision in *Faretta* and may only be applied where

25

*Faretta* is not implicated. (See *People v. Johnson* (2012) 53 Cal.4th 519, 526 [explaining that post-*Faretta*, "Penal Code section 686.1 . . . cannot be given effect"].) We acknowledge the importance of ensuring proceedings are fair and " 'appear fair to all who observe them.' " (*Indiana v. Edwards* (2008) 554 U.S. 164, 177.) But once a court determines that a competent defendant has knowingly and voluntarily asserted the right to self-representation under *Faretta*, the court is not authorized to revoke that right in an attempt to ensure that the defense case meets some minimum level of effectiveness. The "likelihood or actuality of a poor performance by a defendant acting in propria persona" does not defeat the right of self-representation. (*People v. Taylor* (2009) 47 Cal.4th 850, 866.)

We reject Daniels's argument that the Eighth Amendment's requirements outweigh an individual's interest in self-representation merely because a defendant has chosen not to participate in the defense. Even where a defendant fails to present any defense or potentially mitigating evidence, the Eighth Amendment's requirement of reliability in death judgments is sufficiently attained " 'when the prosecution has discharged its burden of proof . . . pursuant to the rules of evidence and within the guidelines of a constitutional death penalty statute, the death verdict has been returned under proper instructions and procedures, and the trier of penalty has duly considered the relevant mitigating evidence, if any, which the defendant has chosen to present.' " (*People v. Mai* (2013) 57 Cal.4th 986, 1056, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1372; see also *Bloom*, *supra*, 48 Cal.3d at 1228.)

We are not persuaded that Daniels's contentions warrant reconsideration of prior decisions by this court. The trial court committed no error in violation of section 686.1.

**D. Knowing and Intelligent Waiver of the Right to a Jury Trial**

Daniels also asserts that the record does not reflect valid waivers of the right to a jury trial in favor of a bench trial. As we explain below, we would find this claim meritorious because the record fails to demonstrate his knowing and intelligent waiver. We find such error to be structural, requiring reversal of Daniels's convictions on all counts tried.

*1. Background*

On December 20, 2000, Judge Ransom engaged Daniels in a *Faretta* colloquy and found that Daniels's decision to represent himself was knowing and intelligent. Immediately after accepting Daniels's counsel waiver, the court asked if Daniels wanted to confirm the jury trial date, to which Daniels responded, "Yes. Keep it the same date for jury."

On January 5, 2001, Daniels appeared, self-represented, before Judge Long. Judge Long provided Daniels with further admonitions about the waiver of counsel. Then, the court accepted Daniels's waiver of his right to trial by jury in favor of a court trial as reflected in the following colloquy:

"THE COURT: The other question I think I might raise with you is do you intend to proceed in terms of the guilt phase, and if there is a penalty phase, by way of a jury trial or by way of a court trial?

"MR. DANIELS: Court trial.

"THE COURT: Are you satisfied that that's what you want to do?

"MR. DANIELS: Yes.

"THE COURT: Do you understand that you have an absolute right to proceed by way of jury trial both in the guilt phase and at penalty phase, if there is a penalty phase, if you want to do that? Do you understand me?

"MR. DANIELS: Yes.

27

"THE COURT: What you are telling me then is that you wish to waive your right to a jury trial in the guilt phase and in the penalty phase which basically means if there is [*sic*] two phases, you will not have a jury determine your fate, but rather the Court will make certain findings based upon what you have been charged with? Do you understand that?

"MR. DANIELS: I understand.

"THE COURT: And more specifically in the posture that we are presently in, that I will be the Judge that will make those determinations. Do you understand that?

"MR. DANIELS: I understand.

"THE COURT: Do you understand that if you go by way of the court trial rather than jury trial, I will decide whether the prosecution has proven its case beyond a reasonable doubt in the guilt phase of the trial, it will be my job to determine whether you are guilty or not guilty of the charges and allegations made against you? Do you understand that?

"MR. DANIELS: I understand.

"THE COURT: Do you understand that I will determine whether the special circumstances are true or not true? Do you understand that?

"MR. DANIELS: Yes.

"THE COURT: Do you understand if I find you guilty of murder, of special circumstances, in the guilt phase of the trial, I will also determine whether the punishment is life without the possibility of parole or the death penalty in the penalty phase of the trial? You understand that?

"MR. DANIELS: Yes, I understand.

"THE COURT: Have you understood everything that I have told you relative to your right to proceed by way of jury trial or by way of court trial?

"MR. DANIELS: Yes.

28

"[THE PROSECUTOR]:  If I could just interject one thing.  You did touch on it, but he would also have the right to have the jury determine the truth or not truth of the special circumstances.  I think you did mention that.

"THE COURT:  Yes.  If you waived jury, then the jury will not determine the truth and validity of the special circumstances, that will be my job to determine whether they are true or not true.  Do you understand that?

"MR. DANIELS:  I understand.

"THE COURT:  Now, in terms of waiving your right to jury trial in both the guilt and if there is a penalty phase, that phase also, are you doing this of your own free will?

"MR. DANIELS:  Yes.

"THE COURT:  Have any threats been made against you or any members of your family to get you to waive your right to a jury trial?

"MR. DANIELS:  No.

"THE COURT:  Have you been subject to any force to get you to waive your right to a jury trial?

"MR. DANIELS:  No.

"THE COURT:  Is there some consideration or secret promise or deal or something that I am not aware of that's making you or forcing you to waive your right to jury trial and proceed by way of court trial?

"MR. DANIELS:  No.

"THE COURT:  Are you presently under the influence of any substance that would cause you not to be able to think clearly?

"MR. DANIELS:  No.

"THE COURT:  Do you know what you are doing?

"MR. DANIELS:  Yes.

"THE COURT:  All right.  Do the People join, also?

29

"[THE PROSECUTOR]:  Yes.

"THE COURT:  Also in the waiver of jury trial rights as to the guilt phase and also if there is a penalty phase, that the People waive their right to a jury trial in the penalty phase?

"[THE PROSECUTOR]:  Yes, People join.

"THE COURT:  All right.  Do you know what you have just done, sir?

"MR. DANIELS:  Yes.

"THE COURT:  All right.  The Court finds that Mr. Daniels understands and freely and voluntarily waives his right to jury trial and has elected to proceed by way of court trial in the guilt phase and also by way of court trial in the penalty phase if, in fact, there is a penalty phase.  And these waivers are now made part of the records of this Court."

The record contains no jury waiver form, and there is no indication that one was ever signed by Daniels.

During the afternoon session of that January 5th proceeding, Daniels — still self-represented — stated his intent to plead guilty to the noncapital counts and to enter pleas admitting the truth and validity of two prior convictions.  In preparation for accepting these pleas, the court obtained oral waivers of Daniels's constitutional rights, including the right to jury trial, as shown in the following exchange:

"THE COURT:  All right.  You have the right to a jury trial.  Do you understand that?

"MR. DANIELS:  Yes.

"THE COURT:  Do you realize that by pleading guilty or admitting the truth and validity of the prior felony convictions alleged against you, you will give up your right to a jury trial as to these matters?

"MR. DANIELS:  Yes.

30

"THE COURT:  And do you give your right up to a jury trial as it pertains to these matters?

"MR. DANIELS:  I do."

On January 16, 2001, the court began a bench trial on the remaining charges.   Before the prosecutor began his first examination, the court sought to confirm Daniels's decision to waive jury trial.  In doing so, the court said to Daniels, "We also talked about your right to a jury trial with members of these communities that would determine whether or not — the question of guilt or innocence.  [¶]  Do you remember that?"  Daniels responded yes.  He reaffirmed his desire to waive trial by jury for both the guilt and penalty phases.

At the start of the penalty phase, the court again informed Daniels that he had a right to have a jury to try the penalty phase, and the court would empanel a jury to determine penalty if he so chose.  Daniels still wished to proceed by court trial.

2. *Analysis*

The record demonstrates Daniels personally and expressly waived a jury trial regarding guilt, special circumstances, and penalty.  This Daniels does not deny, and indeed, the record reveals no equivocation in his request to waive a jury for all phases of trial.  He makes no claim that his waiver was coerced or otherwise involuntary.  What Daniels instead contends is that his waiver was infirm because the record does not demonstrate he made his waiver with full awareness of the nature of the right being relinquished.  The court, he contends, did not inform him that a jury would be comprised of 12 impartial members who must reach a unanimous verdict, nor did it explain the consequences of a hung jury.  The record contains no indication that counsel discussed the jury trial right during the course of representation, and Daniels asserts that he received no advisements from counsel regarding this right.

31

Under both the federal Constitution and the California Constitution, a defendant in a criminal prosecution is guaranteed the right to a jury trial. (*People v. Weaver* (2012) 53 Cal.4th 1056, 1071 (*Weaver*).) Nonetheless, as enshrined in our state Constitution, a "jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16.) Waiver must be "express[ed] in words . . . and will not be implied from a defendant's conduct." (*People v. Holmes* (1960) 54 Cal.2d 442, 443–444 (*Holmes*).) Moreover, a court may not accept a defendant's waiver of a jury trial unless the waiver "is knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,' " ' as well as voluntary ' " 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " ' " (*Collins*, *supra*, 26 Cal.4th at p. 305.)

We uphold the validity of a jury waiver " 'if the record *affirmatively* shows that it is voluntary and intelligent under the totality of the circumstances.' " (*Collins*, *supra*, 26 Cal.4th at p. 310, italics added.) We do not start with a presumption of validity that may only be rebutted by signs of a defendant's confusion or unwillingness in entering a waiver. Instead, a reviewing court satisfies itself of a legitimate waiver only when the record affirmatively demonstrates it was knowing and intelligent.

Our inquiry into the totality of the circumstances requires us to take nuanced account of the full set of relevant facts in this case. (See *Adams v. U.S. ex rel. McCann* (1942) 317 U.S. 269, 278 (*Adams*) ["[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case."].) In our prior cases, we have assessed whether a knowing and intelligent waiver was given by examining factors such as the nature of the colloquy prior to the court's acceptance of a

32

waiver, the presence of counsel and references to discussions between the defendant and counsel regarding the jury right, and the existence and contents of a written waiver. For instance, this court has upheld an express jury waiver made "with counsel's consent and agreement" where other circumstances bolstered the conclusion that defendant's waiver was knowing and intelligent. (*People v. Cunningham* (2015) 61 Cal.4th 609, 637.) In *Cunningham*, the represented defendant received "a full explanation from the court of the right and the consequences of the waiver." (*Ibid.*) The defendant expressly acknowledged, moreover, that "(1) he had an absolute right to a jury trial in both the guilt and penalty phases of his trial, (2) in a jury trial, if one of the 12 jurors was not convinced beyond a reasonable doubt that defendant was guilty, the jury could not return a guilty verdict, (3) if he waived his right to a jury trial, instead of 12 people deciding the issue of his guilt or innocence, the judge alone would make that decision, and (4) it could be easier for the prosecution to convince only one person, as opposed to 12, that defendant was guilty beyond a reasonable doubt." (*Id.* at p. 636.)

We were persuaded, in another case, that a knowing and intelligent waiver had been taken after considering how the defendant had executed two written waivers reflecting his desire to give up his right to trial by jury; one of the forms, also signed by counsel, stated that defense counsel " 'fully explained' " to the defendant the terms " 'jury trial' " and " 'court trial' " and the " 'difference between a "jury trial" and a "court trial." ' " (*Weaver*, *supra*, 53 Cal.4th at p. 1070.) In addition, the court described to the defendant several differences between the two types of trials, informing him that he had an absolute right to a unanimous decision by twelve " 'citizens of the community.' " (*Ibid.*) We have upheld another waiver as knowing and intelligent where the prosecutor explained, among other items, "what a jury trial was and that the jury would have to agree

33

unanimously on guilt, special circumstances, and penalty" and both defense counsel and the prosecutor joined in the waiver. (*People v. Scott* (1997) 15 Cal.4th 1188, 1208 (*Scott*).) And in yet another case, we found a valid waiver where the "[d]efendant was represented by two apparently competent counsel who over the course of several days discussed with him 'at length' the consequences and nature of his proposed waiver" and, prior to accepting the waiver, the court "engaged [defendant] in an extensive and thorough voir dire" which included this advisement: "You understand, also, that if you do waive jury and submit it to the Court, the Court will act solely. If you have a jury trial, before a verdict can be returned either way, it requires unanimous agreement of all 12 jurors; do you understand that?" (*People v. Robertson* (1989) 48 Cal.3d 18, 36–37 & fn. 5.) These facts of our prior cases by no means establish requirements for effective jury waivers; they simply illustrate instances in which this court has found waivers to be knowing and intelligent.

Consistent with our precedent and in recognition of the fact-intensive nature of our inquiry, we first analyze the trial court's record advisements preceding its acceptance of Daniels's jury waiver. The trial court's admonitions are relevant only to the extent that they shed light on the state of a defendant's knowledge at the time of waiver about the nature of the right he or she would give up and the consequences of doing so. Yet the in-court colloquy serves an essential purpose of facilitating meaningful appellate review of a defendant's waiver of fundamental constitutional rights. Following the high court's decision in *Boykin v. Alabama* (1969) 395 U.S. 238, this court amended our test for determining the validity of guilty pleas — one that previously required explicit admonitions — to align with the federal test. (*People v. Howard* (1992) 1 Cal.4th 1132, 1175.) In that regard, we established that a guilty plea is effective "if the record affirmatively shows that it is voluntary and intelligent under the totality of the

34

circumstances." (*Ibid.*) We further explained that "explicit admonitions and waivers still serve the purpose that originally led us to require them: They are the only realistic means of assuring that the judge leaves a record adequate for review." (*Id.* at pp. 1178–1179; accord, *Koontz, supra,* 27 Cal.4th at p. 1071 ["the purpose of the suggested *Lopez* admonitions is to ensure a clear record of a knowing and voluntary waiver of counsel"].) A meaningful colloquy — or lack thereof — bears on our ability, on review, to confirm whether a valid waiver of rights was given.

This court has persistently declined to mandate any specific admonitions describing aspects of the jury trial right. (See, e.g., *Weaver, supra,* 53 Cal.4th at p. 1074; *People v. Sivongxxay* (2017) 3 Cal.5th 151, 170 (*Sivongxxay*).) We continue to eschew any rigid rubric for trial courts to follow in order to decide whether to accept a defendant's relinquishment of this right. But the trial court is not merely a passive receiver of an attempted waiver. We have long recognized the responsibility of the courts to adequately advise defendants before accepting their waivers of fundamental rights. The court's obligation "to advise [the] defendant of his right to jury trial" and to "determine impartially whether [the] defendant's waiver of jury trial was knowing, intelligent, and voluntary" is a "constitutional procedural duty." (*Collins, supra,* 26 Cal.4th at pp. 308–309; see also *U.S. v. Duarte-Higareda* (9th Cir. 1997) 113 F.3d 1000, 1003 [under certain circumstances, district court may be "obliged to conduct a colloquy . . . to carry out its 'serious and weighty responsibility' of ensuring that a defendant's jury waiver is voluntary, knowing, and intelligent"].) How to best achieve this goal is left to the trial courts. Although we offer some exemplars of advisements and colloquy elements that may be helpful in establishing that a waiver was knowing and intelligent, *post*, we do not seek to require that trial courts provide any particular advisements.

35

If the trial court is not persuaded the waiver is knowing and intelligent, the court cannot accept it. (See *Collins*, *supra*, 26 Cal.4th at p. 305 ["a defendant's waiver of the right to jury trial may not be accepted by the court unless it is knowing and intelligent"].) The federal Constitution, after all, guarantees the right to a jury trial but does not provide for a right to a court trial. (*Singer v. United States* (1965) 380 U.S. 24, 34–35.) As the high court has elaborated, a jury trial is the "normal" and often "preferable mode of disposing of issues of fact in criminal cases above the grade of petty offenses." (*Patton v. United States* (1930) 281 U.S. 276, 312 (*Patton*); accord, *U.S. v. Martin* (6th Cir. 1983) 704 F.2d 267, 272 (*Martin*).) Not only must the right to jury trial be "jealously preserved," but due to the traditional and important role of the jury as a factfinding body in criminal cases, a waiver is only effective if given with the consent of government counsel, the sanction of the court, and "the express and intelligent consent of the defendant." (*Patton*, at p. 312.) While the right to jury trial is waivable, "we 'do not presume acquiescence in the loss of fundamental rights.' " (*Johnson v. Zerbst* (1938) 304 U.S. 458, 464.)

What the court did in this case — immediately after accepting Daniels's counsel waiver on December 20, 2000 — was ask if Daniels wished to confirm the jury trial date. Daniels replied: "Yes. Keep it the same date for jury." He did not ask about waiving a jury. In fact, it was the judge who broached the issue on January 5, 2001. He did so by asking whether Daniels wished to proceed by jury trial or court trial. In response to the court's inquiry, Daniels opted for a court trial. Up until that point, Daniels never explicitly requested or referenced a court trial. (Cf. *Sivongxxay*, *supra*, 3 Cal.5th at p. 167 [defendant initiated request to waive jury].)

The court orally advised Daniels that the judge alone, instead of a jury, would make determinations in the different phases of his capital trial. The court

36

admonished Daniels that, in the event of waiver, the judge alone would determine whether Daniels was guilty, whether special circumstances were true, and whether the appropriate punishment was death. This information may have illuminated the nature of the court trial Daniels was opting to pursue. But Daniels was provided nearly no information about the right he would abandon. The court did not, prior to accepting the waiver, elaborate on what a jury trial entails, other than that it is not the same thing as a trial before a judge. The court did not explain anything about the nature of the jury — for example, what constitutes a jury, how a jury is selected, or that jury members must be impartial and their verdict unanimous. Daniels replied yes to the court's questions, "Do you know what you are doing?" and, moments later, "Do you know what you have just done?" With that, the court accepted Daniels's express oral waiver on January 5. The court never inquired whether — even in a general sense — Daniels understood what a jury trial entailed, or if he had any questions about the waiver of the jury right. The waiver was never memorialized in writing.

When the guilt phase commenced a week and a half later, on January 16, 2001, the court sought to orally confirm that Daniels maintained his desire to proceed by way of court trial. The court stated, "We also talked about your right to a jury trial with members of these communities that would determine whether or not — the question of guilt or innocence. [¶] Do you remember that?" The court was mistaken on this point: it had not previously informed Daniels that members of the community would determine guilt or innocence. Nonetheless, Daniels responded "Yes" to the court's query of whether he recalled such an advisement. This exchange reveals a discrepancy between what the court evidently believed it told Daniels and what it actually told him. Daniels's affirmative response as to whether he remembered the purported previous advisement, despite no record it was given, ultimately provides little support for

37

conclusion that Daniels's waiver was based on full awareness of the nature of the jury trial right.

The appellate record contains a January 4, 2001, memorandum with the subject line "Waivers," which was filed by the prosecutor. In this memorandum, the prosecutor requested that the court conduct supplemental colloquies as to various waivers. One proposed advisement was, "You have an absolute right to have your case heard by a jury of twelve persons." The court did not provide this advisement to Daniels, nor did it mention this memorandum in any proceedings. The record does not establish that Daniels ever received, much less read or understood, this memorandum. Although Daniels is listed as an intended recipient, there is no proof of service or any notation of service on the document. In contrast, a "Notice of Evidence in Aggravation" memorandum dated two days earlier on January 2 bears the notation, "Hand delivered to Daniels 1/3/01," with the prosecutor's initials. The Notice of Evidence in Aggravation memorandum was also discussed on the record in Daniels's presence, while the Waivers memorandum was never referenced in court. The Waivers memorandum does not contain indicia of reliability which would accompany a written waiver signed by the defendant or a document referenced during court proceedings. Thus, the existence of this memorandum is minimally probative in our assessment of Daniels's knowledge. We know of no other written materials in the record regarding Daniels's waiver of his jury right.

To its credit, the court obtained Daniels's express waiver for three separate phases of trial: guilt, special circumstances, and penalty. The prosecutor, perhaps cognizant of the People's interest in ensuring that the record reflected a valid waiver, interjected at one point to confirm that Daniels would waive a jury for the special-circumstance determinations. What remains both striking and relevant,

38

however, is that the court accepted Daniels's waiver without ever inquiring as to Daniels's understanding of *any* substantive aspect of what a jury is.

The People point out that Daniels "never expressed confusion or asked for clarification regarding his jury trial right." While this may be true, we decline to infer Daniels's knowledge from his failure to ask unprompted questions of the court. And though an utterance of bewilderment might have weighed in favor of our finding Daniels's waiver to *not* be knowledgeable, the absence of such an expression does not push us toward the inverse finding of a knowing waiver. The phrase "You don't know what you don't know" encapsulates the futility of relying on defendants to raise questions or identify misunderstandings on their own when they lack the very basis to understand what lies beyond the scope of their knowledge.

We do not dispute that Daniels expressly affirmed — multiple times — his desire to waive a jury for all trial phases. But we decline to conflate a knowing, intelligent waiver with an emphatic one. The former is constitutionally required; the latter is not. Moreover, our concurring and dissenting colleagues are mistaken in declaring that we "dismiss Daniels's repeated affirmations that he understood his right to a jury trial and the consequences of forgoing it." (Conc. & dis. opn. of Corrigan, J., *post*, at p. 16.) Not once did Daniels say he understood what the jury right entails. We are not persuaded that Daniels's purported "overarching aim . . . to accept responsibility for the charged crimes" is relevant to whether his jury trial waiver was knowing and intelligent. (Conc. opn. of Kruger, J., *post*, at p. 2.) That a defendant "may have made a 'tactical choice' to waive a jury tells us nothing about whether he understood what he would be giving up by making such a choice." (*U.S. v. Shorty* (9th Cir. 2013) 741 F.3d 961, 969 (*Shorty*).) Nor was Daniels permitted by statute to plead guilty to capital charges in any event, so it strains logic to assume we should in any way give weight to his desire to plead

39

guilty when — after it was settled that Daniels would proceed to trial on the murder counts and related charges — the trial court was still required to ensure a constitutionally valid proffered waiver.

Confidence does not imply comprehension. Individuals are entirely capable of categorically asserting a position without awareness that the roots of that position lie in ignorance or lack of reflection. It was incumbent upon the court to verify, not merely to assume, that Daniels indeed grasped the actual nature of the jury right — even if only at a basic level. In his own mind, Daniels may have had an impression of what a jury trial is. Just what impression that was — and whether it bore any relationship at all to the required constitutional standard — is well beyond what we can discern from this record.

Our concurring and dissenting colleagues may believe Daniels demonstrated "some legal sophistication by filing a written motion to represent himself and referring to his 'Faretta' right." (See conc. & dis. opn. of Corrigan, J., *post*, at p. 16.) That's *some* definition of "legal sophistication." The "written motion" was a fill-in-the-blank *Faretta* form motion; Daniels failed even to fill in all the blanks. He also handwrote a note to the judge that stated, "I am also Requesting that I Be allowed to Represent myself, my feretta [*sic*] Rights." This misspelled reference to *Faretta* perhaps disclosed the gist of his aim to represent himself, but Daniels's request does not demonstrate legal sophistication, much less his understanding of the jury trial right. Even a defendant with enough acumen to invoke the *Faretta* right by filling in all the blanks of a form or drafting his or her own motion in no way forfeits the protections rooted in the wholly distinct requirement that waiver of a jury trial right must be knowing and intelligent. Of course, what must be knowing and intelligent for present purposes is Daniels's understanding of the *jury trial* right, not his appreciation of the separate *Faretta* right.

40

A proper weighing of the totality of the circumstances forces us to take into account Daniels's lack of representation, even if it was his own choice to exercise his right to self-representation. The sparseness of the colloquy's substance in this case is especially conspicuous given that Daniels was without the benefit of counsel when he proffered his waiver. Counsel plays a crucial part in transmitting information to the client. Time and time again, our precedent has recognized as much, incorporating within the totality of relevant circumstances not only the fact of representation by counsel, but also record references to discussions between counsel and defendant. (See, e.g., *Weaver*, *supra*, 53 Cal.4th at p. 1075 [valid waiver, in part, because "the court gave [the defendant] ample time to consider and reconsider his decision and to discuss it fully with counsel"]; *People v. Scott*, *supra*, 15 Cal.4th at p. 1209 ["That the defendant discussed the decision with counsel and relied on counsel's advice strengthens, not weakens, the waiver's validity"]; *People v. Diaz* (1992) 3 Cal.4th 495, 571 [valid waiver, in part, because "defendant acknowledged that he had thoroughly discussed the jury waiver with his attorney"].) Here, Daniels had representation for approximately eleven months before he discharged counsel on December 20, 2000, and about four of those months elapsed after a trial date had been set. Yet there is no indication that counsel had at any point discussed with Daniels the substantive nature of a jury trial or the consequences of giving one up in favor of a court trial in his capital case. The People argue we should "presume[] that competent counsel would have informed [Daniels] of the nature of a jury trial." Although we decline the People's invitation to speculate as to possible discussions with counsel which would have had no bearing on decisions made or topics even mentioned on the record during the course of counsel's representation, we observe that their argument correctly evinces the importance our cases have placed on an attorney's role in explaining the jury right to a layperson defendant, and not the mere fact of representation.

41

As we have found, *ante,* Daniels's waiver of counsel was knowing and intelligent. But while Daniels's choice to represent himself meant that he agreed to assume certain duties of counsel, perhaps to his detriment, this decision did not constructively vest him with the knowledge and intelligence he was entitled to have as a defendant entering a jury trial waiver. It bears repeating that our cases do not treat a jury trial waiver as valid solely because a defendant has counsel; we have ascribed importance to the presence of counsel only insofar as it tells us something about the state of a defendant's substantive awareness of the nature of the jury trial right and the consequences of forgoing it.

Here, Daniels's waiver of counsel did not signify his willingness to forgo access to basic, meaningful information about his separate jury trial right. When the court advised Daniels of what self-representation would entail, it certainly did not probe Daniels's knowledge of the jury right, nor did it mention that the court would no longer be obliged to ensure his jury waiver was knowing and intelligent. Hence, Daniels's valid counsel waiver did not absolve the court of its duty to ensure a valid waiver of his separate constitutional right to be tried by a jury. Considering the inferences this court has consistently drawn from counsel representation in assessing the validity of jury waivers, our inability to surmise that Daniels had any discussions with counsel about a jury waiver means that we have one less assurance that Daniels understood the nature of the right he was relinquishing and the effects of doing so.

A defendant's knowing and intelligent waiver of jury trial is required by both the state and federal Constitutions and applies to both represented and self-represented defendants. In *Barnum*, we invalidated a rule requiring trial courts to advise in propria persona defendants of the privilege against compelled self-incrimination before they were called by the People or testified in their own defense. (*People v. Barnum* (2003) 29 Cal.4th 1210 (*Barnum*) [disapproving

42

*Killpatrick v. Superior Court* (1957) 153 Cal.App.2d 146 and *People v. Kramer* (1964) 227 Cal.App.2d 199].)  That rule, known as the *Killpatrick-Kramer* rule — which did *not* mandate advisements for represented defendants but did mandate them for in propria persona defendants — was a judge-made prophylactic rule of procedure.  (*Barnum*, at p. 1218.)  We reached our holding only after observing that the *Killpatrick-Kramer* rule did "not have any counterpart in the federal courts or in the courts of the vast majority of our sister states."  (*Barnum*, at p. 1214.)  In doing so, we also rejected the argument that "because a right like the privilege against compelled self-incrimination may be lost only by waiver, and because a waiver is effective only if it is knowing, intelligent, and voluntary, the effectiveness of a waiver is ensured only if the trial court gives an advisement of what is to be relinquished."  (*Id.* at p. 1224; see *id.* at p. 1223.)  We explained, among other things, that the right against self-incrimination is a right that can be forfeited at trial by failure to assert it in a timely fashion, and the law does not generally demand that courts issue special admonitions to self-represented litigants concerning similar matters of trial procedure and strategy.  (*Id.* at pp. 1223–1224.)

The jury trial right, by contrast, is not subject to forfeiture.  (*Collins*, *supra*, 26 Cal.4th at p. 305, fn. 2 [the jury trial right is a "fundamental constitutional right that, although clearly waivable, may be waived only if there is evidence in the record that the decision to do so was knowing, intelligent, and voluntary"], as cited in *Barnum*, *supra*, 29 Cal.4th at p. 1224.)  The question here thus is not, as in *Barnum*, whether self-represented litigants should receive special admonitions about trial practice to avoid inadvertent or ill-advised forfeitures of constitutional rights.  The question is instead whether we can conclude that "there is evidence in the record that [a defendant's waiver decision] . . . was knowing, intelligent, and voluntary" (*Collins* at p. 305, fn. 2), where no such evidence appears, solely

43

because the defendant chose to forgo representation by counsel. Thus, *Barnum* is of little relevance in the instant case.

Similarly, cases from other jurisdictions do not aid the People here. Our concurring and dissenting colleagues draw on *DeRobertis*, a habeas case from the Seventh Circuit, for the proposition that a knowing and intelligent waiver requires only that a defendant "understood that the choice confronting him, was on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge." (*U.S. ex rel. Williams v. DeRobertis* (7th Cir. 1983) 715 F.2d 1174, 1180 (*DeRobertis*).) The court here told Daniels as much — at least prior to the presentation of evidence at trial, if not at the time the jury waiver was actually entered. But the Seventh Circuit's finding of a valid waiver hinged in significant part on the role of competent counsel in advising the defendant. (*DeRobertis*, at p. 1181, italics added ["We are unpersuaded that . . . it would be fundamentally unfair to give effect to a waiver executed without knowledge of [certain jury trial] attributes, *particularly where the defendant was represented by competent counsel* . . . ."]; *id.* at pp. 1177, 1180–1181 [defendant waived jury trial on advice of counsel].)

This reasoning reinforces an important principle: Courts generally rely on counsel to transmit to defendants critical information about whether to waive the jury trial right and the consequences of waiving it, and they do not assume that defendants otherwise already possess requisite information to make a knowing and intelligent waiver. *DeRobertis* does not hold that a bare-bones mention of trying the case to a judge rather than jury, without further explanation, would be sufficient in the absence of advice from competent counsel or other affirmative indications of the defendant's legal sophistication. (Cf. *Adams*, *supra*, 317 U.S. at pp. 270–271 [self-represented defendant indicated that he had studied law and repeatedly demanded a bench trial]; *Maryland v. Bell* (1998) 720 A.2d 311, 319–

44

320 [distinguishing prior decision in which the defendant "was given *no* explanation of the nature of a jury trial," other than a minimal mention of trying the case before the court rather than a jury, from a case in which the defendant was advised of certain "other fundamentals of a jury trial," and the defendant and "his trial counsel also had discussed the right to a jury trial prior to the hearing"].)

To facilitate courts' enforcement of constitutional safeguards, we offer general guidance for trial courts in ensuring a defendant's knowing and intelligent jury waiver in favor of court trial. As explained in our recent *Sivongxxay* decision, this court recommends that trial judges conduct a waiver colloquy expressly relaying at least four "basic mechanics of a jury trial": "(1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) Additional questioning may assist the court in ensuring a defendant comprehends what the jury right entails and the consequences of waiving it. (See *id.* at pp. 169–170.) In situations where a defendant has waived counsel, we also endorse the practice of appointing standby counsel for the limited purpose of discussing with the defendant the decision to waive a jury. (See, e.g., *U.S. v. Sammons* (6th Cir. 1990) 918 F.2d 592, 595 [self-represented defendant consulted with appointed standby counsel during a 10-minute recess before making an oral motion to waive jury trial]; *State v. Clemons* (2002) 273 Kan. 328, 340 [standby counsel available, and self-represented defendant indicated to court he had discussed jury waiver with counsel]; *State v. Barros* (Haw.Ct.App. 2004) 95 P.3d 14, 22–23 [court thrice referred pro per defendant to a public defender for consultation about jury waiver].) This may be done even when, as here, a defendant declines offers for standby or advisory counsel, for "a court may

45

appoint counsel over an accused's objection in order to protect the public interest in the fairness and integrity of the proceedings." (*Massie v. Sumner* (9th Cir. 1980) 624 F.2d 72, 74; accord, *McKaskle v. Wiggins* (1984) 465 U.S. 168, 178 [appointment of standby counsel to represent defendant does not violate Sixth Amendment right to self-representation, even if appointment is made over defendant's objection].)

The People maintain that Daniels was sufficiently aware of essential aspects of a jury trial because of his extensive experience with the criminal justice system, and not merely because of the advisements given in this case. The record contains certified copies of five of Daniels's prior felony convictions. Two of these convictions were introduced at the guilt phase to establish prior strikes within the meaning of the Three Strikes Law: a January 1986 conviction for attempted first degree burglary; and a July 1991 robbery conviction. During the penalty phase, the prosecution additionally introduced certified copies of three prior convictions as evidence in aggravation: a March 1988 conviction for possession of a controlled substance; an October 1990 conviction for sale of a controlled substance; and a February 1998 conviction for second degree burglary. All five convictions were the result of guilty pleas, and in all those plea proceedings Daniels was represented by counsel. In none of those cases did the presiding judge conduct any inquiry into Daniels's understanding of the jury right beyond counsel's representations. The plea colloquy for Daniels's 1986 attempted burglary conviction reflects a court advisement that Daniels had a right to either a jury trial or a court trial, with no discussion of what a jury trial entails. And the record of Daniels's February 1998 burglary plea is comprised of a complaint, a series of minute orders, and a judgment — with no recorded advisement of rights. For each of Daniels's felony pleas in March 1988, October 1990, and July 1991, counsel represented that he or she advised Daniels — each time with the exact

46

same language — "that he cannot be convicted unless all twelve jurors agree that the prosecution has proved his guilt beyond a reasonable doubt."

Given these facts, the People's contention raises a fundamental question: How much weight to afford such prior pleas in assessing the totality of the circumstances indicating whether a jury trial right waiver is "knowing and intelligent"?  It is true that we have previously inferred some degree of a defendant's knowledge and intelligence of the jury right from a vaguely articulated cognizance of criminal history.  (See *People v. Langdon* (1959) 52 Cal.2d 425, 432 [no duty of trial court to inquire into waiver of jury trial, in part, because defendant had "been before the criminal courts on at least three previous occasions"].)  This court has also once upheld a guilt phase jury waiver after consideration of several factors, including the fact the defendant had previously pleaded guilty to two prior offenses, once signing a waiver stating that he "fully underst[ood]" his right to a jury trial.  (*Sivongxxay*, *supra*, 3 Cal.5th at p. 167.)  We are mindful, however, that courts — both state and federal — exercise prudence in determining what types of prior criminal experience would be most relevant to the waiver at issue, and nothing in our prior cases supports the conclusion that a defendant's receipt of previous advisements is bound to satisfy the requirement that a subsequent waiver of a jury trial right be knowing and intelligent.

Consider *Parke v. Raley* as an example.  When the high court stated that "evidence of a defendant's prior experience with the criminal justice system [is] relevant to the question whether he knowingly waived constitutional rights," it did so in the context of examining evidence of prior guilty pleas to determine the validity of the guilty plea at issue.  (*Parke v. Raley* (1992) 506 U.S. 20, 37.)  And when criminal history is brought to bear on an inquiry into a waiver of the right to a jury trial in favor of a bench trial, the most relevant experience is *previously*

47

*having undergone a criminal trial.*  (See, e.g., *People v. Mosby* (2004) 33 Cal.4th 353, 364 ["defendant, who was represented by counsel, had *just* undergone a jury trial"]; *U.S. v. Carmenate* (2d Cir. 2008) 544 F.3d 105, 108–109  ["Defendant's experience with the criminal justice system—having been recently tried before, and convicted by, a jury for similar offenses—is further evidence that he understood the nature of a jury trial"]; *State v. Spurlock* (La. 2015) 175 So.3d 955, 956 ["defendant has past experience as an accused in the trial of a criminal prosecution where he was found guilty by a jury"]; *State v. Rizzo* (2011) 303 Conn. 71, 93 ["because the defendant previously had been sentenced to death by a jury, he had particularly relevant personal experience with the criminal justice system" and "defendant responded affirmatively to the trial court's query: '[S]o you have been through this process before . . . so you have a complete understanding [of] how that works. Is that a fair statement . . . ?' "].)  Here, we know of no evidence that Daniels had ever previously stood trial.

Nor can we ignore that the plea colloquies describing certain elements of the jury right preceded Daniels's jury waiver in this matter by a decade in one case, 11 years in another case, and 13 years in another.  Unless we assume Daniels already harbored the kind of detailed knowledge of the jury system that would make the previous advisements all but irrelevant, to weigh those previous advisements so heavily implies an enormously contingent conclusion about the quality of Daniels's memory and the extent of knowledge he gleaned from those advisements.  In a recent Ninth Circuit case, the government likewise asserted the defendant's waiver was knowing and intelligent because he had prior experience with the criminal justice system, including both prior guilty pleas and a three-day jury trial.  (*Shorty*, 741 F.3d at p. 968.)  In *Shorty*, the court rejected this argument because, among other reasons, "[E]ven if [the defendant] was properly instructed on his right to a jury trial, nothing suggests that he retained that information ten,

48

fifteen, or even twenty years later when he waived the right again in 2010." (*Ibid.*) The record in Daniels's case does not contain evidence that Daniels had cognitive impairments that may have affected his ability to understand the consequences of waiving a jury trial, unlike the record in *Shorty* (see *id.* at p. 967). Yet we find only an attenuated connection, at best, between Daniels's jury trial right waivers in this capital case and the oral advice Daniels received in connection with guilty pleas a decade earlier.

A court may not accept a jury waiver that is not "knowing and intelligent, that is, ' " ' 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*Collins*, *supra*, 26 Cal.4th at p. 305.) Here, the court may have advised Daniels of a modicum of meaningful information about the nature of a jury trial before accepting his waiver, insofar as it told him that the right applied to each of the three phases of trial. Daniels was orally informed that the judge alone would decide his fate at different stages in his trial. Daniels also consistently replied in the affirmative when asked whether he understood what he was being told. Nonetheless, Daniels tendered his waiver without assistance of counsel — appointed or standby. And nowhere does the record offer even a suggestion that he ever discussed the jury right with competent counsel. We do not find that the court made a sufficient effort to assure that this self-represented defendant understood any substantive aspects of the fundamental jury trial right he would give up in this case. The court's only reference to any characteristic of a jury occurred when it asked Daniels — a week and a half after the waiver was accepted — whether he recalled an earlier conversation (that had not occurred) regarding "members of these communities" who would determine guilt or innocence. Guilty plea colloquies from over 10 years prior demonstrate that Daniels had previously in his life been orally advised of certain characteristics of a jury trial. But we are

49

not persuaded that these remote plea advisements can patch the record's void on this question of whether Daniels waived his jury right in this case in accordance with constitutional requirements. We have never before found an effective waiver of jury based on so few available inferences. Neither the People nor any of our concurring and dissenting colleagues is able to identify a single case when our court has upheld a jury waiver based on so thin a record. We conclude, based on the totality of the circumstances of this record, that the trial court erred in accepting Daniels's jury trial waiver.

Unfortunately, a majority of the court does not share our view that Daniels's waivers of jury trial were invalid as to all three phases of trial. Instead, four members of the court today would find Daniels's guilt phase and special-circumstance phase waivers to be knowing and intelligent. (See conc. & dis. opn. of Corrigan, J., *post*, at p. 26; conc. opn. of Kruger, J., *post*, at p. 2.) To elucidate why we do not concur in the judgment supported by a court majority to affirm Daniels's guilt convictions and the true findings of the special circumstances, we assess the consequences of the error we have found.

A failure to obtain an informed waiver results in a complete denial of defendant's right to a jury trial. (See *People v. Tran* (2015) 61 Cal.4th 1160, 1169.) Both the high court and this court hold that the complete deprivation of the constitutional jury trial right is a structural error compelling reversal. (See *Rose v. Clark* (1986) 478 U.S. 570, 578 ["the State cannot contend that the deprivation was harmless because the evidence established the defendant's guilt; the error in such a case is that the wrong entity judged the defendant guilty"]; *Collins*, *supra*, 26 Cal.4th at p. 312 ["improperly inducing a waiver of that right amounts to a 'structural defect in the proceedings' requiring that the judgment of conviction be set aside without the necessity of a determination of prejudice"]; *People v. Cahill* (1993) 5 Cal.4th 478, 501 ["the denial of the defendant's right to a jury trial . . .

50

involve[s] fundamental 'structural defects' in the judicial proceedings" (citation omitted)].) " '[I]f a court should undertake to deny to a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt.' " (*Cahill*, at p. 490, quoting *People v. O'Bryan* (1913) 165 Cal. 55, 65–66 (lead opn. of Sloss, J.).)

In California, an effective waiver of the right to a jury trial requires that a defendant's waiver be express, voluntary, knowing, and intelligent. (*Holmes*, *supra*, 54 Cal.2d at pp. 443–444 [waiver must be "express[ed] in words . . . and will not be implied from a defendant's conduct"]; *Collins*, *supra*, 26 Cal.4th at p. 305 [court may not accept a defendant's waiver of a jury trial "unless it is knowing and intelligent . . . as well as voluntary"].) In *Ernst*, we found that the failure to obtain the defendant's *express* waiver of his right to a jury trial required reversal. (*People v. Ernst* (1994) 8 Cal.4th 441, 446.) In *Collins*, we held that the court's error of inducing an *involuntary* waiver from the defendant amounted to a structural defect. (*Collins*, *supra*, 26 Cal.4th at p. 312.) Knowledge and intelligence are required components of an effective waiver of jury trial and are equally pivotal as the requirements that a waiver be express and voluntary. Hence, a court's failure to obtain a knowing and intelligent waiver falls within the limited class of errors that infect the integrity of proceedings to such a degree that they are reversible per se.

The court obtained Daniels's waivers of jury trial for guilt, special circumstance determinations, and penalty immediately in succession after conveying roughly the same information. Constitutional inadequacies, we find, pervade the entire trial. Daniels was denied his fundamental right to a jury trial under the state and federal Constitutions. We cannot attempt to assess the prejudice Daniels suffered as a result of this deprivation. In accordance with

51

precedent from both the high court and our court, we would reverse the judgment of the superior court on all counts tried, on the basis of structural error arising from Daniels's ineffective waivers of jury trial. We respectfully dissent from the judgment of the court, which affirms the guilt convictions for all counts tried and the true findings of special circumstances.

The record is even more bereft of support for the conclusion that Daniels's penalty phase waiver was valid. Any weight that could conceivably be accorded to Daniels's prior pleas, for example, would be diminished in an assessment of whether there is support in the record to conclude that Daniels's jury waiver at the penalty phase was knowing and intelligent. Even supposing Daniels retained the information received orally in connection with guilty pleas to burglary and drug charges over 10 years prior, we are not persuaded there is an adequate basis to presume Daniels's knowledge that any particular jury attributes would necessarily translate to the unique context of punishment determinations in capital trials.

Although the court provided Daniels another opportunity to opt for a jury trial right before the penalty phase, it did not describe any aspect of a jury's role in the penalty phase or otherwise add to what had been conveyed to Daniels earlier in the trial. A defendant's decision to waive the right to have a jury determine whether he or she will be subjected to the death penalty is enormously consequential, as "[t]he decision to waive the right to jury sentencing may deprive a capital defendant of potentially life-saving advantages." (*Jells v. Ohio* (1991) 498 U.S. 1111, 1114 (dis. opn. from cert. denial of Marshall, J.).) If it is appropriate to question just how much generalized knowledge of the criminal jury exists in a typical layperson drawn from the general public — and it is — such a person is even less likely to understand the intricacies of the decisionmaker's role in the penalty phase of a capital trial. In contrast with the guilt phase, the decisionmaker's role at the capital penalty phase "is not merely to find facts, but

52

also—and most important—to render an individualized, *normative* determination about the penalty appropriate for the particular defendant—i.e., whether he should live or die." (*People v. Brown* (1988) 46 Cal.3d 432, 448.) " '[O]ne of the most important functions any jury can perform in making . . . a selection (between life imprisonment and death for a defendant convicted in a capital case) is to maintain a link between contemporary community values and the penal system.' " (*Gregg v. Georgia* (1976) 428 U.S. 153, 181.)

The federal Constitution imposes a "special ' "need for reliability in the determination that death is the appropriate punishment." ' " (*Johnson v. Mississippi* (1988) 486 U.S. 578, 584.) The judicial duty to ensure a valid waiver "is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity." (*Patton*, *supra*, 281 U.S. at pp. 312–313; accord, *Martin*, *supra*, 704 F.2d at pp. 272–273; see also *U.S. v. U.S. Dist. Court for E. Dist. of Cal.* (9th Cir. 2006) 464 F.3d 1065, 1069 [U.S. Supreme Court in *Patton* "emphasized the pivotal role of trial by jury in the criminal context, particularly where the defendant is charged with a serious crime"].) A societal interest in the integrity of the capital process may at times outweigh a defendant's stated preferences in controlling his or her own case. For example, as discussed, *ante*, state law prevents any defendant from pleading guilty to capital charges without consent of counsel, in light of "the state's strong interest in reducing the risk of mistaken judgments in capital cases and thereby maintaining the accuracy and fairness of its criminal proceedings." (*Alfaro*, *supra*, 41 Cal.4th at p. 1300.) In capital cases, the trial court must scrupulously discharge its responsibility to protect the integrity of the judicial process and maintain constitutional safeguards. We concur in the judgment of the court to find

53

Daniels's penalty phase waiver invalid, and we agree Daniels's death judgment must be reversed.

### E. Sentence of Death Imposed in Connection with Daniels's Conviction of Second Degree Murder

Count 21 charged Daniels with the murder of LaTanya McCoy and alleged a multiple-murder special circumstance. (See § 190.2, subd. (a)(3).) The court convicted Daniels of McCoy's murder in the second degree and found true the special circumstance. The court later sentenced Daniels to death on count 21, in addition to imposing a death sentence on count 12, the first degree murder of LeWayne Carolina committed while engaged in the commission of robbery and burglary.

Daniels argues, and the People agree, that the death sentence imposed for the second degree murder of LaTanya McCoy was legally unauthorized. The death penalty may only be imposed where the defendant has been convicted of first degree murder and the factfinder has found true any charged special circumstance. (§§ 190.1, subd. (a), 190.3, 190.4, subd. (a).) We have held that the offense of second degree murder is not punishable by death. (*People v. Thomas* (2012) 53 Cal.4th 771, 837.) Instead, the penalty for second degree murder of a person other than a police officer is 15 years to life. (§ 190, subd. (a).)

The court has already found that Daniels's death judgment warrants reversal on the basis of an invalid penalty phase waiver. Given that the sentence imposed in connection with count 21 was unauthorized to begin with, we shall resolve this claim by vacating that sentence and directing the trial court to issue an amended abstract of judgment reflecting the appropriate sentence.

### F. Cumulative Error

Daniels urges us to consider the cumulative effect of errors in his trial. A majority of this court would hold that no error occurred affecting his guilt

54

convictions or the true findings of special circumstances.  Hence, Daniels's claim

of cumulative error fails.

### III. CONCLUSION

We, the undersigned, agree that most of Daniels's claims are unavailing. But we cannot conclude from this record that the trial court's acceptance of Daniels's jury waiver complied with the constitutional requirements that the waiver must be knowing and intelligent. Because we find Daniels's waiver of jury trial was invalid in consideration of the totality of the circumstances, we would reverse Daniels's convictions with respect to all counts tried (counts 12–16 and 20–22), the true findings establishing the presence of special circumstances, and his death sentence. Accordingly, we dissent from the court's judgment today to affirm the validity of Daniels's jury trial waivers for the guilt phase and special-circumstance determinations, and we concur in the reversal of Daniels's death judgment on the basis of an invalid penalty phase waiver.

In all other respects, we would affirm.

**CUÉLLAR, J.**


**WE CONCUR:**

**WERDEGAR, J.**
**LIU, J.**

**CONCURRING OPINION BY LIU, J. TO THE LEAD OPINION, CONCURRING AND DISSENTING IN THE JUDGMENT OF THE COURT**

I agree with today's lead opinion that David Scott Daniels, a capital defendant proceeding without counsel, did not make a knowing and intelligent jury trial waiver. The fact that Daniels repeatedly and "most emphatically" said he understood what he was doing (conc. & dis. opn. of Corrigan, J., *post*, at pp. 15–16) is of limited significance because there is no indication in the record of what he understood. Similarly, although Daniels's "manifest desire was to plead guilty" (conc. opn. of Kruger, J., *post*, at p. 2), it does not follow that his jury trial waiver was knowing and intelligent. Justice Kruger speculates that "while an express advisement about the fundamental attributes of jury trial might have made even clearer to defendant the protection that a jury might afford, there is every indication that he did not want that protection at his trial on the substantive charges — and that additional advisements on that point, if anything, would have simply reinforced his resolve to waive a jury trial." (*Id.* at pp. 3–4.) But how can we conclude that Daniels "did not want that protection" and would have persisted in admitting guilt, when the record contains no indication that he understood what "that protection" consists of? Finally, although it is true that Daniels had been advised by counsel in different proceedings a decade earlier and that the trial court here told Daniels that a jury consists of members of the community, these circumstances do not show that his jury trial waiver in this case was knowing and intelligent.

For the average reader (or writer) of judicial opinions, it is perhaps elementary what a jury is and how it functions in a criminal trial. But we cannot assume such knowledge among the general populace or even in "a literate high school graduate." (Conc. & dis. opn. of Corrigan, J., *post*, at p. 16.) Although schoolchildren are "capable" of understanding the concept of a jury trial (*People v. Barrett* (2012) 54 Cal.4th 1081, 1130 (conc. & dis. opn. of Liu, J.)), the state of our citizenry's actual knowledge of basic civics leaves much to be desired.

One recent study found that roughly one-third of Americans cannot name a single branch of government. (Annenberg Public Policy Center, *Americans' Knowledge of the Branches of Government Is Declining* (Sept. 13, 2016) <http://www.annenbergpublicpolicycenter.org/americans-knowledge-of-the-branches-of-government-is-declining/> [as of Aug. 31, 2017].) Another study reported that 75% of Americans cannot explain what the judiciary does and that one in three native-born citizens would fail the civics portion of the U.S. naturalization test. (Greene, *Study: One in Three Americans Fails Naturalization Civics Test* (Apr. 30, 2012) U.S. News & World Report <https://www.usnews.com/news/blogs/washington-whispers/2012/04/30/study-one-in-three-americans-fails-naturalization-civics-test> [as of Aug. 31, 2017] [reporting on Xavier University study].) In California, half of high school seniors cannot state the function of the United States Supreme Court; their understanding of the structures and functions of government is "modest, at best." (Kahne et al., Constitutional Rights Foundation, The California Survey of Civic Education (2005) pp. 4, 8.) I would not assume that despite these glaring gaps in civic literacy, the average American nonetheless has a clear understanding of the right to a jury trial. (But see conc. & dis. opn. of Corrigan, J., *post*, at p. 19, fn. 5.)

Judges have long recognized these shortcomings in the citizenry's knowledge of civics and the role of courts. Retired United States Supreme Court

2

Justice Sandra Day O'Connor has called attention to the "steady decline" of civics education over the past generation (O'Connor & Hamilton, *A democracy without civics?* (Sept. 18, 2008) The Christian Science Monitor, at p. 9), with particular concern for students' understanding of "the importance of an independent judiciary" (Singer, *Trailblazing Justice Now Has Games on Docket*, N.Y. Times (Mar. 28, 2016) p. B1).  Justice O'Connor is not alone.  (See Cantil-Sakauye & Padilla, *Engage, protect your democracy*, The Sacramento Bee (Sept. 17, 2015) p. 7B [noting that "more than 20 percent of Californians typically do not report for jury service when summoned" and urging California schools to get civics education "back on track" by "teach[ing] students how our government works, how the three branches provide checks and balances, and how to participate in our democracy"].)

There is an additional reason why courts cannot assume that laypeople know the fundamental features of a jury trial:  Those features vary from one setting to the next.  The unanimity requirement, for instance, has long been considered an essential aspect of jury trials (3 Blackstone, Commentaries 375–376), and under the California Constitution, criminal defendants are entitled to a unanimous jury verdict (Cal. Const., art. I, § 16).  But in civil cases, "three-fourths of the jury may render a verdict." (*Ibid*.)  Moreover, although the Sixth Amendment to the federal Constitution requires juror unanimity in federal criminal cases, that federal constitutional requirement does not extend to state courts.  (See *Apodaca v. Oregon* (1972) 406 U.S. 404; *McDonald v. City of Chicago* (2010) 561 U.S. 742, 766, fn. 14.)  In fact, some states permit criminal convictions with less-than-unanimous jury verdicts.  (See Or. Const., art. I, § 11 ["[I]n the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict."]; La. Const., art. I, § 17 ["A case in which

3

the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict."].)

The jury's role in a capital case is particularly likely to be unfamiliar. The defendant is unlikely ever to have experienced a capital trial (certainly this was Daniels's first), and the jury performs a unique function when considering whether to render a death verdict. "Unlike its role at the guilt phase, the jury's role in a capital penalty trial 'is not merely to find facts, but also — and most important — to render an individualized, *normative* determination about the penalty appropriate for the particular defendant — i.e., whether he should live or die.' [Citations.] This inherently ' "moral endeavor" ' [citation], which is designed ' "to maintain a link between contemporary community values and the penal system" ' [citation], renders a defendant's decision to waive a jury trial at the penalty phase particularly consequential." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 212 (conc. & dis. opn. of Liu, J.).) The jury's normative function as sentencer in a capital trial is unusual and especially unlikely to be a matter of common understanding. The record before us provides no indication that Daniels waived a jury trial " ' " 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*People v. Collins* (2001) 26 Cal.4th 297, 305 (*Collins*).)

Instead of quoting this language in *Collins* as the standard by which we assess whether a jury trial waiver is knowing and intelligent, Justice Corrigan cites *Adams v. U.S. ex rel. McCann* (1942) 317 U.S. 269 and *U.S. ex rel. Williams v. DeRobertis* (7th Cir. 1983) 715 F.2d 1174, and asserts that it is enough if the defendant understands " 'that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge.' " (Conc. & dis. opn. of Corrigan, J., *post*, at p. 15.) But *Collins* is the controlling authority here, and I do

not agree that simply knowing a jury is comprised of people from the community amounts to a " ' " 'full awareness' " ' " of the nature of the jury trial right. (*Collins*, *supra*, 26 Cal.4th at p. 305.)  It is true that *Collins* "invalidated the defendant's jury trial waiver for lack of *voluntariness*."  (Conc. & dis. opn. of Corrigan, J., *post*, at p. 15, fn. 3.)  But we have repeatedly applied *Collins* to assess whether a jury trial waiver was knowing and intelligent.  (See *People v. Sivongxxay* (2017) 3 Cal.5th 151, 166, 171 (*Sivongxxay*); *People v. Weaver* (2012) 53 Cal.4th 1056, 1071–1072.)

Finally, Justice Corrigan contends that the validity of Daniels's jury trial waiver follows from our recent decision in *Sivongxxay*.  (Conc. & dis. opn. of Corrigan, J., *post*, at pp. 14, 18, 22.)  But the defendant in *Sivongxxay* proceeded with the assistance of counsel, whereas Daniels did not.  Our opinion in *Sivongxxay* repeatedly emphasized the importance of this fact.  (See *Sivongxxay*, *supra*, 3 Cal.5th at p. 167 ["Although defendant is a Laotian refugee with no formal education and limited English proficiency, he was represented by counsel."]; *id*. at p. 173, fn. 7 ["By contrast, because defendant, who was represented by counsel at all pertinent times, had a right to a jury trial with regard to the special circumstance allegation at the time he entered his jury waiver [citation], his comprehensive waiver is properly understood as subsuming that right."]; *id*. at p. 174, fn. 8 ["[H]ere the relevant circumstances include not only the colloquy, but also . . . the fact that defendant was represented by counsel."]; *id*. at p. 174 [Sivongxxay stated his desire to waive jury trial "through counsel"]; *id*. at p. 188 ["Defendant personally entered what we have determined to be a knowing and intelligent jury trial waiver, and did so with the assistance of counsel."]; *id*. at p. 189 ["Even though defendant was not told by the judge that a jury would have to unanimously agree on a death sentence for such a sentence to be imposed, he was . . . represented by counsel in connection with the jury

5

waiver."].)  Daniels does not argue that unrepresented defendants are categorically barred from waiving their right to a jury trial.  His contention is that the absence of counsel is a significant factor in assessing whether a jury trial waiver is knowing and intelligent.

In sum, the record here shows that Daniels was intent on waiving a jury trial.  But it does not show that he made the decision, as to the guilt phase or the penalty phase, " ' " 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*Collins*, *supra*, 26 Cal.4th at p. 305.)

LIU, J.

I CONCUR:

CUÉLLAR, J.

6

**CONCURRING AND DISSENTING OPINION BY CORRIGAN, J. TO THE LEAD OPINION, CONCURRING AND DISSENTING IN THE JUDGMENT OF THE COURT**

I concur in the court's judgment affirming all guilty verdicts and all true findings against defendant David Scott Daniels. I also concur in the court's judgment insofar as it vacates the unauthorized sentence of death in connection with count 21 and directs the superior court to amend the abstract of judgment to reflect a sentence of 15 years to life on that count. I join in Justice Cuéllar's lead opinion setting forth the statement of facts (part I) and its resolution of all issues except part II.D.

I respectfully dissent from the court's reversal of the death judgment for the murder of LeWayne Carolina (count 12). I would conclude that Daniels knowingly and intelligently waived his right to a jury trial in favor of a bench trial for both the guilt and the penalty phases.

"The Sixth Amendment teaches that we should accord the competent defendant, even in a capital case, . . . control over his destiny" by allowing him to forgo representation by counsel and the presentation of a defense. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1063 (*Stansbury*), reversed on another ground in *Stansbury v. California* (1994) 511 U.S. 318, 326–327; accord, *People v. Bloom* (1989) 48 Cal.3d 1194, 1228 (*Bloom*).) Facing two counts of murder with special circumstances and numerous other serious felony counts, Daniels expressed a desire to plead guilty to all charges. When his counsel refused to agree, Daniels

moved to represent himself. The motion was granted, and Daniels pleaded guilty to vehicle theft, carjacking, and 11 counts of robbery. Informed that he could not plead guilty to the murders, which carried a possible verdict of death, or to other related counts, Daniels waived his right to a jury trial in favor of a bench trial for both the guilt and penalty phases. He repeatedly declined the assistance of a defense investigator or advisory counsel. He presented no evidence, cross-examined no witnesses, and made no argument on his behalf. The trial court convicted him of all remaining counts and entered a judgment of death.

The record demonstrates that Daniels personally and expressly waived the right to jury trial on the issues of guilt, special circumstances, and penalty. Daniels now contends, however, that the record does not demonstrate his waiver was knowing and intelligent. He faults the trial court for failing to advise him that a jury consists of 12 members, that the jurors must be impartial, and that they must unanimously agree in order to reach a verdict. He also assigns as error the trial court's failure to advise him about the consequences of non-unanimity. He claims that his penalty phase waiver was invalid "for the same reasons that his earlier waiver of a jury at the guilt phase was invalid" and for the additional reason that he was not told his waiver of a jury trial would result in the "loss of the right to an independent trial court review of the penalty imposed by a jury." Daniels asserts that he received no advisements from counsel before discharge regarding the jury trial right.

Daniels's arguments are unpersuasive. As recently as two months ago, we reaffirmed that that there is no "rigid formula or particular form of words that a trial court must use in taking a jury waiver." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 169 (*Sivongxxay*).) We rejected a rule "that a jury waiver colloquy invariably must discuss juror impartiality, the unanimity requirement, or both for an ensuing waiver to be knowing and intelligent." (*Id*. at p. 168.) Here, Daniels

2

personally entered an express waiver of his right to jury trial three separate times: twice before trial began and a third time before the start of the penalty phase. During the colloquy, the trial court informed Daniels that he had a right to be tried by a jury made up of members of the community and that, if he waived jury trial, the court alone would determine the issues of guilt, special circumstances, and penalty. Daniels stated no fewer than 15 times that he understood the jury trial right he was giving up. He unwaveringly assured the court that he understood the nature of the proceedings and the decisions he had made. He specifically expressed his confidence that he would receive a fair trial before the judge who would hear his case. He was no stranger to criminal proceedings. Approximately a decade before, when represented by counsel, he had thrice pleaded guilty after being informed that he was entitled to a unanimous verdict of 12 jurors on the question of guilt. The totality of these circumstances demonstrates a knowing and intelligent waiver of the jury trial right.

## I. BACKGROUND

Because the outcome of this case turns heavily on the colloquies between Daniels and the court, they are set forth in detail here. On August 7, 2000, before the preliminary hearing, Daniels informed the court that he "wish[ed] to plead guilty." When his counsel interjected, "He doesn't mean that," Daniels retorted, "I know exactly what I'm saying. We discussed this already." Counsel told the court that she had advised Daniels to enter not guilty pleas so that the case could proceed to preliminary hearing. Daniels responded, "I understand exactly what she is saying. What I am saying [is] I am prepared to enter a plea of guilty." The court replied that Daniels could not enter a guilty plea without his counsel's consent. Defense counsel proposed a sentence of life without the possibility of parole in exchange for defendant's guilty plea, but the prosecutor refused. The

3

court then entered pleas of not guilty. Following a preliminary hearing, Daniels was held to answer on 22 of 24 charges.

On December 7, 2000, after Daniels was arraigned on the information, he filed a letter requesting that he be allowed to represent himself and to plead guilty to the charges. In the letter, he stated, "I fully understand that I am charged with the Capitol [*sic*] offense of Murder penal code section 187 with the special circumstances." Daniels also filed a written motion in support of his request. On December 20, the court questioned Daniels about his choice to waive counsel. It advised him that he was facing the death penalty and that, even if he chose self-representation, he could not plead guilty to the capital charges. Daniels said he understood. The court admonished Daniels about his right to be represented by counsel and the risks of self-representation. Daniels affirmed that he understood each of the court's admonishments and that he wanted to exercise his "Faretta" right. Daniels executed a written waiver, and the court granted his request to proceed pro se. When asked if he wanted the assistance of advisory counsel, Daniels declined. The court asked, "Are you sure of that?" and Daniels responded, "Positive."

Two weeks later, on January 5, 2001, Daniels appeared before a different judge for trial. Again, the court extensively discussed Daniels's desire to represent himself. After reviewing the charges, the court emphasized that they were "very, very serious" and that the special circumstance allegations exposed him to the death penalty. Daniels said that he understood. The court warned that the prosecutor was an expert in capital litigation, it is unwise to elect self-representation, and Daniels would be at a "severe disadvantage." The court likened it to "a flag football team going up against the Tennessee Titans." Daniels stated that he understood and that "I don't look at it as a disadvantage." The court emphasized that Daniels would have to conduct himself in a lawyerly fashion and

4

that he would receive no special assistance from the court. It also stated that Daniels would forgo an ineffective assistance of counsel claim on appeal. Daniels indicated that he understood everything the court had explained. The court asked Daniels if he was "thinking clearly." Daniels replied, "Yes, I am" and affirmed that he knew what he was doing. Daniels said that he was 33 years old, had graduated from Galileo High School in San Francisco, and was literate. He had previously worked as a mailroom clerk which required him to read and understand documents. He did not suffer from mental illness and was not under the influence of any substance that would impair his judgment. He made his request freely and voluntarily, without any threats or pressure. The court then asked Daniels if he was "satisfied that you know what you are doing?" to which he replied, "Yeah." Daniels declined the assistance of advisory counsel. The court took a 15-minute recess to allow Daniels to think about his decision. When proceedings resumed, the court asked Daniels if he felt capable of presenting a defense on his own behalf, to which he replied, "Yes, I do." The court then found that Daniels had made a knowing, intelligent, and voluntary waiver of his right to counsel and confirmed his pro se status. Daniels again executed a written waiver of his right to counsel.

The court then asked Daniels if he wished to proceed "by way of jury trial or by way of court trial." Daniels replied, "Court trial." The following colloquy ensued:

"THE COURT: Are you satisfied that that's what you want to do?

"MR. DANIELS: Yes.

"THE COURT: Do you understand that you have an absolute right to proceed by way of jury trial both in the guilt phase and at [the] penalty phase, if there is a penalty phase, if you want to do that? Do you understand me?

"MR. DANIELS: Yes.

5

"THE COURT:  What you are telling me then is that you wish to waive your right to a jury trial in the guilt phase and in the penalty phase which basically means if there is [*sic*] two phases, you will not have a jury determine your fate, but rather the Court will make certain findings based upon what you have been charged with?  Do you understand that?

"MR. DANIELS:  I understand.

"THE COURT:  And more specifically in the posture that we are presently in, that I will be the Judge that will make those determinations.  Do you understand that?

"MR. DANIELS:  I understand.

"THE COURT:  Do you understand that if you go by way of the court trial rather than jury trial, I will decide whether the prosecution has proven its case beyond a reasonable doubt in the guilt phase of the trial, it will be my job to determine whether you are guilty or not guilty of the charges and allegations made against you?  Do you understand that?

"MR. DANIELS:  I understand.

"THE COURT:  Do you understand that I will determine whether the special circumstances are true or not true?  Do you understand that?

"MR. DANIELS:  Yes.

"THE COURT:  Do you understand if I find you guilty of murder, of special circumstances, in the guilt phase of the trial, I will also determine whether the punishment is life without the possibility of parole or the death penalty in the penalty phase of the trial?  You understand that?

"MR. DANIELS:  Yes, I understand.

"THE COURT:  Have you understood everything that I have told you relative to your right to proceed by way of jury trial or by way of court trial?

"MR. DANIELS:  Yes.

6

"[THE PROSECUTOR]: If I could just interject one thing. You did touch on it, but he would also have the right to have the jury determine the truth or not truth of the special circumstances. I think you did mention that.

"THE COURT: Yes. If you waived jury, then the jury will not determine the truth and validity of the special circumstances, that will be my job to determine whether they are true or not true. Do you understand that?

"MR. DANIELS: I understand."

Daniels confirmed that he was waiving his right to jury trial of his own free will, he had not received any threats or promises, and he was not under the influence of any substance that would cloud his judgment. The court then asked, "Do you know what you are doing?" to which Daniels replied, "Yes." After obtaining a waiver from the People, the court again asked Daniels, "Do you know what you have just done, sir?" to which Daniels again replied, "Yes." The court found a knowing, intelligent, and voluntary waiver of the right to jury trial.

Daniels declined the services of a defense investigator. He then stated his desire to plead guilty to the noncapital counts and to enter pleas admitting the truth and validity of two prior convictions. The court obtained oral waivers of Daniels's constitutional rights, including the right to jury trial:

"THE COURT: Although I reference jury trial, you have a right not only to — these charges, you have a right to a jury trial and a court trial, but my understanding is you don't want either one of those, you wish to plead guilty and to admit, right?

"MR. DANIELS: Yes.

"THE COURT: So when I reference just jury trial, is the understanding between the People and you, Mr. Daniels, that although I just say jury trial, that it also pertains to court trial rights? Do you understand that?

"MR. DANIELS: Yes.

7

"THE COURT: Now, is there anything at all that I have done or said so far that you do not understand?

"MR. DANIELS: No.

"THE COURT: All right. You have the right to a jury trial. Do you understand that?

"MR. DANIELS: Yes.

"THE COURT: Do you realize that by pleading guilty or admitting the truth and validity of the prior felony convictions alleged against you[,] you will give up your right to a jury trial as to these matters?

"MR. DANIELS: Yes.

"THE COURT: And do you give your right up to a jury trial as it pertains to these matters?

"MR. DANIELS: I do."

On January 16, 2001, court trial began on the remaining charges. Before the prosecutor's opening statement, the court revisited Daniels's waivers of the right to counsel and jury trial. The court offered to appoint counsel "even at this late date," but Daniels declined. The court offered Daniels the services of an investigator and advisory counsel; again Daniels declined. The court then noted, "We also talked about your right to a jury trial *with members of these communities* that would determine whether or not — the question of guilt or innocence." (Italics added.) Daniels responded that he remembered discussing this with the court. The following colloquy transpired:

"THE COURT: And you would have a right to a jury trial, certainly in terms of the guilt phase, and if we get beyond the guilt phase, you would have that same right if you wish to have that right as it pertains to the question of penalty. [¶] Do you understand what I am telling you at this stage?

"[MR. DANIELS]: Yes, Your Honor.

8

"THE COURT:  And despite that, it is still your request and still your view that you wish to waive any jury in this matter and proceed by way of court trial, is that true?

"[MR. DANIELS]:  Yes, I do, Your Honor.

"THE COURT:  Do you understand fully that what this means is that I will try the question of your guilt or your innocence.  [¶]  Do you understand that?

"[MR. DANIELS]:  I understand, Your Honor.

"THE COURT:  And if, in fact, we go to a penalty phase, that I will, in fact, try the question about whether or not aggravating factors outweigh those mitigating factors.  [¶]  Do you understand — do you understand that?

"[MR. DANIELS]:  I do.

"THE COURT:  And despite me telling you all of this, you still wish to proceed in the legal posture that you are presently in?

"[MR. DANIELS]:  Yes, Your Honor.  I do."

During the guilt phase, Daniels presented no evidence or argument and engaged in no cross-examination.  The trial court convicted him on all counts and found true all special allegations and enhancements.

On January 19, before the penalty phase trial began, the prosecutor informed the court that he had spoken to Daniels and had "advised him that . . . he does have the right to present mitigating evidence in his own defense if he wishes."  The prosecutor reported that he had offered Daniels the services of an investigator to help him present a case in mitigation, but Daniels had declined.  The court told Daniels he faced "the gravest consequences in the criminal law in terms of punishment."  The court explained that, at this phase of the trial, "the District Attorney is going to present what is called aggravating factors" and that Daniels would "have the right to present what is known as mitigating evidence that the [court] . . . would consider relative to aggravating factors versus mitigating

9

factors." Based on this evidence, the court would "consider whether or not you should be imprisoned for the rest of your life without the possibility of parole, or whether you shall suffer death." The court offered to "stop these legal proceedings, appoint a lawyer, appoint advisory counsel, appoint an investigator for you, and give them ample time to prepare before we enter this penalty phase." Daniels declined, stating, "Your Honor, I respect and thank you for being concerned, that you are the Judge James L. Long, and I trust and have faith in you, whatever your decision is." The court replied, "Do you realize, although you have waived your right to a jury trial, that I would empanel a jury to try these questions in the penalty phase, you have that right, but heretofore you have waived that right, and said you wanted a court trial. [¶] Do you still feel that way?" Daniels responded, "I do." The court then observed: "Now, Mr. Daniels, I have watched you in terms of your demeanor, your manner, physical movement, your verbal statements, looking for any indication that you are not competent within the meaning of California law. [¶] I have watched you carefully. I have asked you earlier do you understand the nature of these proceedings?" Daniels replied that he did, and stated that he was capable of presenting a penalty phase defense.

Daniels in fact presented no defense or argument. He apologized to the victims' families.

In a statement to the probation officer after trial, Daniels explained that "he chose not to fight the case, choosing to plead guilty to the majority of the charges, to put this matter behind him and to bring some closure to this case. He felt it would be unfair to the victims and their surviving family members for him to attempt to fight these charges, knowing he was guilty of each of the crimes."

## II. DISCUSSION

The Sixth Amendment guarantees a criminal defendant "the right to a speedy and public trial, by an impartial jury . . . ." (U.S. Const., 6th Amend.)

10

Article I, section 16 of the California Constitution guarantees to a defendant accused of a felony a jury of 12 persons and a unanimous verdict. (See also *People v. Collins* (1976) 17 Cal.3d 687, 693.)

A criminal defendant may waive the right to a jury trial in favor of a bench trial. (*Patton v. United States* (1930) 281 U.S. 276, 299, 312; Cal. Const., art. I, § 16.) The question of an effective waiver of a federal constitutional right is governed by federal standards. (*People v. Howard* (1992) 1 Cal.4th 1132, 1175 (*Howard*).) "[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." (*United States v. Ruiz* (2002) 536 U.S. 622, 629.) Additionally, the California Constitution requires that a criminal jury trial waiver be "by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16.)

A proper advisement and waiver of the jury trial right on the record generally establishes a defendant's voluntary and intelligent admission. (*People v. Mosby* (2004) 33 Cal.4th 353, 356 (*Mosby*).) Our inquiry is not limited to the waiver colloquy, however. The test of a valid waiver ultimately turns, not on whether specific warnings or advisements were given, but whether "the record affirmatively shows that [the waiver] is voluntary and intelligent under the totality of the circumstances." (*Howard*, *supra*, 1 Cal.4th at p. 1175 [guilty plea waiver]; accord, *Sivongxxay*, *supra*, 3 Cal.5th at p. 166 [waiver of jury trial]; *People v. Lawley* (2002) 27 Cal.4th 102, 140 (*Lawley*) [waiver of counsel].) We independently examine the entire record to determine whether this standard has been met. (*People v. Burgener* (2009) 46 Cal.4th 231, 241 (*Burgener*); *People v. Doolin* (2009) 45 Cal.4th 390, 453.)

11

Daniels contends that his jury trial waiver was invalid because the court did not advise him that a jury is made up of 12 members who must be impartial and must unanimously agree on a verdict; nor did it explain the consequences of a hung jury. His arguments are contrary to settled precedent.

We have consistently eschewed any rigid formula or particular form of words that a trial court must use to ensure that a jury trial waiver is knowing and intelligent. (*Sivongxxay*, *supra*, 3 Cal.5th at pp. 169–170; see *Lawley*, *supra*, 27 Cal.4th at p. 140 [discussing waiver of the right to counsel]; see also *Iowa v. Tovar* (2004) 541 U.S. 77, 88 [same].) The court need not employ legalese or " 'talismanic phrase[s].' " (*Howard*, *supra*, 1 Cal.4th at p. 1180.) Instead, like the United States Supreme Court, we take a " 'pragmatic approach to the waiver question' " that considers what would be " 'obvious to an accused' " who is executing the waiver. (*Tovar*, at p. 90, cited with approval in *Burgener*, *supra*, 46 Cal.4th at p. 242). "The information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." (*Tovar*, at p. 88.) "The standard was and remains whether the [waiver] represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." (*North Carolina v. Alford* (1970) 400 U.S. 25, 31 [discussing guilty plea waiver].)

Daniels was advised that he had a right to be tried by a jury drawn from members of the community, and that if he waived jury trial, the court alone would determine the issues of guilt, special circumstances, and penalty.[1] This is the

---

[1] In one of the several pretrial colloquies, the court explicitly referred to the "right to a jury trial *with members of these communitie*s that would determine . . . the question of guilt or innocence" and "that same right . . . as it pertains to the

*(footnote continued on next page)*

essence of the jury trial right. "The purpose of the jury trial . . . is to prevent oppression by the Government. 'Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.' [Citation.] Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." (*Williams v. Florida* (1970) 399 U.S. 78, 100, quoting *Duncan v. Louisiana* (1968) 391 U.S. 145, 156.) Conversely, the primary consequence of waiving the right to a jury trial is that the defendant "no longer has the buffer of the judgment of his fellow citizens between him and the imposition of punishment by the state, but instead his fate is in the hands of a state official." (*U.S. ex rel. Williams v. DeRobertis* (7th Cir. 1983) 715 F.2d 1174, 1178 (*DeRobertis*).) Here, repeated admonitions consistently stressed that court and jury trials were different. Daniels was told again and again that, if he waived his right to a jury, the court alone would decide

---

*(footnote continued from previous page)*
question of penalty." (Italics added.) After being so advised, Daniels again waived his right to a jury trial.

My colleagues in the plurality downplay the court's reference to members of the community, noting that the trial court stated it had previously discussed the point with Daniels when in fact it had not. My colleagues infer that Daniels's agreement with the court suggests he did not fully comprehend the previous admonitions. (Conc. & dis. opn. of Cuéllar, J., *ante*, at pp. 37–38.) This interpretation strains credulity. Daniels's failure to challenge the court's representation of the previous discussion instead tends to demonstrate his basic understanding from the outset that jurors are drawn from the community. He certainly did not express confusion or surprise.

13

whether the charges and special allegations had been proven and, if so, what sentence Daniels would receive.

The court was not constitutionally required to go further and enumerate specifics, such as that a jury is made up of 12 members of the community, that the jury members must be impartial, and that their verdict must be unanimous. The high court " 'has never held that a defendant, when waiving the right to a jury, constitutionally is entitled to be canvassed by the trial court, let alone to require a specifically formulated canvass . . . .' " (*Sivongxxay, supra*, 3 Cal.5th at p. 168, quoting *State v. Rizzo* (Conn. 2011) 31 A.3d 1094, 1116.) Recently, we observed in *Sivongxxay* that this court has "never insisted that a jury waiver colloquy invariably must discuss juror impartiality, the unanimity requirement, or both for an ensuing waiver to be knowing and intelligent." (*Sivongxxay*, at p. 168.) While it may be better practice for the trial court to advise the defendant of basic jury trial mechanics,[2] *Sivongxxay* emphasized that "a trial court's adaptation of or departure from the recommended colloquy in an individual case will not necessarily render an ensuing jury waiver invalid." (*Sivongxxay*, at p. 170.) We have never imposed a higher standard for a knowing and intelligent waiver under the state Constitution than that established by the United States Supreme Court. (See *Sivongxxay*, at p. 166; *People v. Collins* (2001) 26 Cal.4th 297, 304–305.)

There is no requirement that a colloquy be complicated in order to be constitutional. Indeed, "[t]he concept of judgment by one's peers is probably

---

[2]    *Sivongxxay* identified the following basic mechanics: "(1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence." (*Sivongxxay, supra*, 3 Cal.5th at p. 169.)

implicit, for most persons, in the term 'jury trial' itself." (*DeRobertis*, *supra*, 715 F.2d at p. 1180, fn. 2.) In *DeRobertis*, the Seventh Circuit upheld a jury trial waiver as knowing and intelligent where the defendant "understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge." (*Id*. at p. 1180.) Daniels, too, was told these basic facts on three separate occasions during the trial, and said that he understood them no fewer than 15 times. At one point Daniels declared, "Your Honor, I respect and thank you for being concerned, that you are the Judge James L. Long, and I trust and have faith in you, whatever your decision is." This record amply demonstrates that Daniels understood the choice he was making: whether "he trusts the judgment of his fellow citizens with his fate, or if he would rather entrust it to the judgment of a solitary state judicial officer." (*DeRobertis*, at p. 1180.)[3] There is absolutely "no

---

[3] Justice Liu characterizes *DeRobertis* as out of step with our precedent. (Conc. & dis. opn. of Liu, J., *ante*, at pp. 4–5.) Not so. We recently cited that case with approval for the proposition that a jury waiver may be knowing and intelligent notwithstanding the lack of specific advisements about the contours of the right. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 168.) By contrast, the case Justice Liu relies on, *People v. Collins*, *supra*, 26 Cal.4th 297, invalidated the defendant's jury trial waiver for lack of *voluntariness*. (*Id*. at pp. 306–309; see conc. & dis. opn. of Liu, J., *ante*, at pp. 4–5.) *Collins* had no occasion to address what circumstances demonstrate a *knowing and intelligent* jury trial waiver, nor did it purport to do so.

My colleagues in the plurality attempt to distinguish *DeRobertis* on the ground that the defendant in that case was represented by counsel while Daniels was not. I discuss this fact in further detail below. Here, I note that my colleagues suggest *DeRobertis* "reinforces an important principle: Courts generally rely on counsel to transmit to defendants critical information about whether to waive the jury trial right and the consequences of waiving it . . . ." (Conc. & dis. opn. of Cuéllar, J., *ante*, at p. 44.) Notably, however, the Seventh Circuit accepted the defendant's representation, supported by affidavit, that counsel *had not informed him* of his right to participate in jury selection and his right to be convicted only

*(footnote continued on next page)*

confusion on defendant's part" regarding his waiver.  (*Lawley*, *supra*, 27 Cal.4th at p. 142.)  Tellingly, Daniels does not challenge the verdicts based on his pleas of guilty, which also encompassed a waiver of the right to trial by jury.  (See *Boykin v. Alabama* (1969) 395 U.S. 238, 243.)

My colleagues in the plurality dismiss Daniels's repeated affirmations that he understood his right to a jury trial and the consequences of forgoing it with the observation that " 'You don't know what you don't know.' "  (Conc. & dis. opn. of Cuéllar, J., *ante*, at p. 39.)  But a review of the entire record casts no doubt on Daniels's understanding.  He was a literate high school graduate who had been gainfully employed.  He showed some legal sophistication by filing a written motion to represent himself and referring to his "Faretta" right.  He spoke most emphatically about his ability to comprehend the proceedings.  When his counsel questioned his desire to plead guilty, he retorted, "I know exactly what I'm saying.  We discussed this already."  He assured the court that he "fully underst[ood]" the charges against him.  He told the court he was "positive" that he did not need the assistance of advisory counsel.  He emphasized his confidence that the court would give him a fair trial.  He had repeated opportunities to ask questions or express reservations.  He did neither.  At one point, the court observed that it had

---

*(footnote continued from previous page)*
upon a substantial majority vote of the jurors.  (*DeRobertis*, *supra*, 715 F.2d at pp. 1177, 1181.)  It held that "*counsel does not have to inform a client of all of the legal and procedural knowledge which forms the basis of his professional advice*." (*Id*. at p. 1182, italics added.)  Instead, what the *DeRobertis* court found significant was that counsel had advised his client to waive a jury trial, and that the defendant had followed that advice.  (*Id*. at pp. 1180, 1182–1183.)  While Daniels did not have counsel's advice, he was aware of the core aspects of *his choice*.  It is also worth noting that counsel's absence resulted from Daniels's affirmative choice to represent himself as he was constitutionally entitled to do.  (*Faretta v. California* (1975) 422 U.S. 806, 819 (*Faretta*).)

carefully watched Daniels's "demeanor, [his] manner, physical movement, [his] verbal statements, looking for any indication that [he was] not competent within the meaning of California law," and noted none.  In the words of the high court, "if the record before us does not show an intelligent and competent waiver . . . by a defendant who demanded again and again that the judge try him, and who in his persistence of such a choice knew what he was about, it would be difficult to conceive of a set of circumstances in which there was such a free choice by a self-determining individual."  (*Adams v. U.S. ex rel. McCann* (1942) 317 U.S. 269, 281 (*Adams*).)

Additionally, Supreme Court precedent teaches that a knowing and intelligent waiver of the jury trial right can depend as much on tactics as on the contours of the right.  In *Adams*, *supra*, 317 U.S. 269, a case involving a self-represented defendant, the court observed that "[t]he less rigorous enforcement of the rules of evidence, the greater informality in trial procedure—these are not the only advantages that the absence of a jury may afford to a layman who prefers to make his own defense.  In a variety of subtle ways trial by jury may be restrictive of a layman's opportunities to present his case as freely as he wishes.  And since trial by jury confers burdens as well as benefits, an accused should be permitted to [forgo] its privileges when his competent judgment counsels him that his interests are safer in the keeping of the judge than of the jury."  (*Id*. at p. 278.)  Here, Daniels elected self-representation and pleaded guilty to all allowable charges.  As to the remaining charges, he requested a court trial[4] and presented no defense or

---

[4]     My colleagues in the plurality state that Daniels "did not ask about waiving a jury" and that "it was the judge who broached the issue."  (Conc. & dis. opn. of Cuéllar, J., *ante*, at p. 36.)  To the extent they suggest Daniels was cajoled into the idea, the record establishes otherwise.  The actual exchange was as follows:  "THE COURT:  The other question I might raise with you is do you intend to proceed in

*(footnote continued on next page)*

17

argument at the guilt or penalty phase of that trial, as was his right. (*Stansbury*, *supra*, 4 Cal.4th at p. 1063; *Bloom*, *supra*, 48 Cal.3d at p. 1228.) He later explained to the probation officer that he chose this course for reasons that were significant to him. He wanted closure, and "felt it would be unfair to the victims and their surviving family members for him to attempt to fight these charges, knowing he was guilty of each of the crimes." The record shows Daniels had been considering his approach to the case for several months and had discussed his wishes with counsel. We have long recognized that a defendant is the master of his own fate, even in a capital case, and that the court cannot "forc[e] an unwilling defendant to accept representation or to present an affirmative penalty defense." (*Bloom*, at p. 1228; accord, *Stansbury*, at p. 1063.) Given Daniels's expressed desire to be convicted and punished, it strains credulity to suggest that his jury trial waiver would have been materially more informed had he been given more detail.

Daniels's own experience with the criminal justice system also supports this conclusion. As the court noted in *Parke v. Raley* (1992) 506 U.S. 20, prior criminal experience is "relevant to the question whether he knowingly waived constitutional rights." (*Id*. at p. 37.) Our case law is in accord. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 167; *Mosby, supra,* 33 Cal.4th at p. 365.) On three occasions between 1988 and 1991, Daniels entered guilty pleas in San Francisco Superior Court while represented by counsel. Each time counsel informed Daniels in open court that he could not be convicted unless all 12 jurors agreed that the prosecution

---

*(footnote continued from previous page)*
terms of the guilt phase, and if there is a penalty phase, *by way of jury trial or by way of court trial?* [¶] MR. DANIELS: Court trial." (Italics added.) By advising the self-represented defendant of his options, the court in no way initiated a waiver, or intimated that Daniels should choose one option over the other.

had proved his guilt beyond a reasonable doubt.  Each time, counsel prefaced the remarks by directly addressing Daniels and telling him it was important for him to listen.  And each time, after counsel's advisements, Daniels confirmed that he had heard the admonishments.[5]

Counsels' advisements to Daniels about the right to a unanimous verdict by 12 jurors in the context of his guilty pleas are relevant to show Daniels's understanding of *that same right* vis-à-vis the decision to proceed by court trial. (*Sivongxxay*, *supra*, 3 Cal.5th at p. 167.)  Although the admonishments occurred a decade or more before this trial, the requirement of a unanimous verdict by 12 jurors is straightforward, and Daniels's behavior during the current proceedings gives us no reason to believe that he had forgotten it.  *Notably, Daniels himself has never claimed such ignorance, either at the trial level or on appeal*.  My

---

[5]      For this reason, it is beside the point that many Americans do not have even a basic understanding of civics.  (Conc. & dis. opn. of Liu, J., *ante*, at pp. 2–3.)  Daniels was no neophyte to the workings of the criminal justice system.  He received an individualized tutorial on the topic in San Francisco's Hall of Justice.

Moreover, the relevant studies documenting this point are too generic to be illuminating.  (Conc. & dis. opn. of Liu, J., *ante*, at pp. 2–3.)  The studies note such things as (1) 31 percent of Americans cannot name a single branch of government (Annenberg Public Policy Center, *Americans' Knowledge of the Branches of Government Is Declining* (Sept. 13, 2006) <http://www.annenbergpublicpolicycenter.org/americans-knowledge-of-the-branches-of-government-is-declining/> [as of Aug. 31, 2017]); (2) 75 percent of Americans do not know the function of the judicial branch (Greene, *Study: One in Three Americans Fails Naturalization Civics Test* (Apr. 30, 2012) U.S. News & World Report <https://www.usnews.com/news/blogs/washington-whispers/2012/04/30/study-one-in-three-americans-fails-naturalization-civics-test> [as of Aug. 31, 2017]); and (3) 50 percent of high school seniors cannot state the function of the United States Supreme Court (Kahne et. al., Constitutional Rights Foundation, The California Survey of Civic Education (2005) p. 8).  While these findings relate generally to the topic of the courts, they do not specifically address the average American's understanding of a jury trial.

colleagues in the plurality imagine the possibility of confusion which Daniels himself has nowhere asserted. (Conc. & dis. opn. of Cuéllar, J., *ante*, at pp. 37–40, 49–50.)

Daniels further attributes significance to the fact that he waived his jury trial right in this case without the assistance of counsel. Such assistance is undoubtedly a relevant consideration in finding a jury trial waiver to be knowing and intelligent. (*Adams*, *supra*, 317 U.S. at p. 277.) Counsel may explain the features of a jury trial, the nuances of jury selection, how a jury is likely to view the facts of the case, and the possibility of a mistrial. Nonetheless, it is well established that a self-represented defendant may validly waive a jury trial without the guiding hand of counsel. (*Id*. at pp. 275–280). The fact that a defendant "lack[s] 'a full and complete appreciation of all of the consequences flowing' from his waiver . . . does not defeat the State's showing that the information it provided to him satisfied the constitutional minimum." (*Patterson v. Illinois* (1988) 487 U.S. 285, 294.) The fact also remains that Daniels affirmatively and repeatedly declined the assistance of counsel.

Whether the defendant is represented or not, the trial court's role is the same. The court must satisfy itself that the defendant's waiver of his constitutional rights is knowing, intelligent, and voluntary. (See *Adams*, *supra*, 317 U.S. at pp. 277–278, 281.) But it need not do more. "The general rule is that a trial court ordinarily is not required to give any advisement to a self-represented defendant who chooses to represent himself or herself after knowingly, intelligently, and voluntarily forgoing the assistance of counsel." (*People v. Barnum* (2003) 29 Cal.4th 1210, 1214.) *Barnum* considered whether the trial court was required to advise a self-represented defendant of the privilege against self-incrimination before the defendant was called as a witness by the prosecution or testified on his own behalf. (*Id*. at pp. 1217–1225.) A long-standing Court of

20

Appeal rule had imposed such a duty based on the logic that " '[w]hen a defendant goes to trial upon a charge of a criminal nature without the benefit of counsel, it is the duty of the court to be alert to protect the defendant's rights.' " (*Killpatrick v. Superior Court* (1957) 153 Cal.App.2d 146, 149.)  In rejecting this rule, *Barnum* held that "a defendant who chooses to represent himself or herself after knowingly, intelligently, and voluntarily forgoing the assistance of counsel *assumes the risk of his or her own ignorance*, and cannot rely upon the trial court to make up for counsel's absence." (*Barnum*, at p. 1224, italics added.)  This is true even where fundamental constitutional rights are at issue.  (*Id.* at pp. 1222–1224.)  My colleagues in the plurality find *Barnum* inapposite because the right to jury trial must be affirmatively waived, whereas the right against self-incrimination at issue in *Barnum* can be forfeited.  (Conc. & dis. opn. of Cuéllar, J., *ante*, at pp. 43–44.)  But for the reasons I have explained, Daniels did make an express, knowing, and intelligent waiver of his right to jury trial.  My point is that the trial court was not required to do more by way of waiver colloquy even though Daniels was self-represented.  By contrast, my colleagues in the plurality would effectively adopt a prophylactic rule mandating additional admonishments for self-represented defendants, much like the prophylactic rule rejected in *Barnum*. (*Barnum*, at p. 1225; see *Howard*, *supra*, 1 Cal.4th at pp. 1178–1179 [explicit admonitions and waivers for the taking of a guilty plea are a prophylactic rule of judicial procedure].)

Here, the court explained the basic mechanism of a jury trial, that members of the community would adjudge defendant's guilt or innocence and the appropriate penalty.  It also explained the consequence of waiving that right, that the court alone would make such determinations.  The court was not required to go further and explain "every single conceivable benefit and burden of the choice

being made" (*People v. Robertson* (1989) 48 Cal.3d 18, 38), in the same degree of detail counsel might have chosen.

Finally, I would not impose a higher standard for a jury trial waiver in a capital case (conc. & dis. opn. of Cuéllar, J., *ante*, at pp. 52–53), or distinguish between the validity of Daniels's guilt and special circumstance waivers and his penalty phase waiver (conc. & dis. opn. of Cuéllar, J., *ante*, at pp. 52–53; conc. & dis. opn. of Liu, J., *ante*, at p. 4; conc. opn. of Kruger, J., *post*, at pp. 2–5).

Daniels argues the trial court was required to inform him that a consequence of his penalty phase waiver would be the loss of the right to an independent trial court review of the penalty imposed by a jury. As he acknowledges, we have previously held that the failure to so advise does not vitiate a jury waiver. (*People v. Robertson*, *supra*, 48 Cal.3d at p. 38.) Moreover, Daniels did not completely forgo an independent review of the death verdict. "When the judge renders a decision on penalty, and thereafter carefully reviews that decision on motion for modification pursuant to [Penal Code] section 190.4, the defendant is afforded ample due process." (*People v. Deere* (1985) 41 Cal.3d 353, 359–360, disapproved on other grounds as recognized in *People v. Brown* (2014) 59 Cal.4th 188, 110–111.) The trial court did so here.

My colleagues in the plurality assert that "[i]n capital cases, the trial court must scrupulously discharge its responsibility to protect the integrity of the judicial process and maintain constitutional safeguards." (Conc. & dis. opn. of Cuéllar, J., *ante*, at pp. 53–54.) They cite *Patton v. United States*, *supra*, 281 U.S. 276, a 1930 decision wherein the Supreme Court observed that the judicial duty to ensure a valid jury trial waiver should be discharged "with a caution increasing in degree as the offenses dealt with increase in gravity." (*Id.* at p. 313; see conc. & dis. opn. of Cuéllar, J., *ante*, at p. 53.) Notwithstanding this general language, neither the high court nor this court has employed a "sliding scale" to evaluate a

22

jury trial waiver based on the complexity or seriousness of the case. In *Godinez v. Moran* (1993) 509 U.S. 389, a capital case, the Supreme Court cited noncapital authority as the applicable standard for a defendant who seeks to plead guilty or waive counsel. (*Id.* at pp. 396, 400–401, citing *Parke v. Raley*, *supra*, 506 U.S. at pp. 28–29; *Faretta*, *supra*, 422 U.S. at p. 835; *Johnson v. Zerbst* (1938) 304 U.S. 458, 468.) Similarly, our recent decision in *Sivongxxay*, *supra*, 3 Cal.5th 151, did not employ a heightened standard to review that capital defendant's waiver of jury trial for guilt or penalty. (*Id.* at pp. 166–169, 188–190.)[6] Finally, it cannot reasonably be argued that having a court trial rather than a jury trial renders the penalty proceedings less reliable under the Eighth Amendment. (See conc. & dis. opn. of Cuéllar, J., *ante*, at p. 53, citing *Johnson v. Mississippi* (1988) 486 U.S. 578, 584.)

My colleagues in the plurality point out that the jury's function at the penalty phase is different than at the guilt phase. At the penalty phase, the jury's role " 'is not merely to find facts, but also—and most important—to render an individualized, *normative* determination about the penalty appropriate for the particular defendant—i.e., whether he should live or die.' " (Conc. & dis. opn. of Cuéllar, J., *ante*, at p. 53, quoting *People v. Brown* (1988) 46 Cal.3d 432, 448; see also conc. & dis. opn. of Liu, J., *ante*, at p. 4.) My colleagues find no basis to conclude that Daniels was aware of the unique characteristics of a penalty phase jury based either on common knowledge or on his prior pleas to noncapital crimes.

---

[6]    We have expressly rejected such an argument in other contexts. (See, e.g., *People v. Lucas* (2014) 60 Cal.4th 153, 222 [no heightened constitutional standard to preserve evidence in a capital trial]; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 161 [no heightened standard for reviewing the sufficiency of the evidence in a capital case]; *People v. Riel* (2000) 22 Cal.4th 1153, 1182 [no heightened standard of proof at the penalty phase trial].)

23

(Conc. & dis. opn. of Cuéllar, J., *ante*, at p. 52; conc. & dis. opn. of Liu, J., *ante*, at p. 4; conc. opn. of Kruger, J., *post*, at p. 4.)  By choosing a court trial, Daniels did not forgo a normative determination of penalty or the prospect of a life without parole sentence.  Whether made by a jury or a judge, the normative features of the penalty decision remain the same.  As discussed above, the basic core of the jury trial right is the "interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence."  (*Williams v. Florida*, *supra*, 399 U.S. at p. 100.)  Daniels was repeatedly advised of this distinction as it pertained to all aspects of his jury trial waiver, including penalty.

Moreover, Daniels was not ignorant of the manner in which a penalty determination would be reached in his case.  Before the penalty phase began, the prosecutor advised Daniels of his right to call witnesses who would present mitigating evidence.  The trial court explained to Daniels that the prosecutor would present evidence in aggravation, and that the court would consider the aggravating factors and mitigating factors in reaching a verdict of death or life imprisonment without the possibility of parole.  Daniels indicated that he understood.  The court persisted in its inquiry, stating, "Do you realize, although you have waived your right to a jury trial, that I would empanel a jury to try these questions in the penalty phase, you have that right, but heretofore you have waived that right, and said you wanted a court trial.  [¶]  Do you still feel that way?"  Daniels replied, "I do."  These advisements are similar to those given in S*ivongxxay*, *supra*, 3 Cal.5th 151.  There, the defendant was told about the basic features of the penalty phase:  that the prosecution would present aggravating evidence and the defendant would have the right to present mitigating evidence.  He was advised that he had a right to a jury trial at the penalty phase and that, if he

24

waived that right, the court would decide the appropriate punishment, which could result in a death sentence. (*Id*. at pp. 188–189.) We upheld the penalty phase jury trial waiver as knowing and intelligent. (*Id*. at pp. 189–190; but see *id*. at p. 189 [observing that the defendant was represented by counsel in connection with the jury waiver].)

I also disagree with the assertion that Daniels's strategy differed between the guilt and penalty phases. (Conc. opn. of Kruger, J., *post*, at p. 4.) True, Daniels did not ask to be sentenced to death. But this is largely beside the point for two reasons. First, the judge was just as capable as the jury of returning a life without parole sentence. Daniels clearly expressed his confidence in Judge Long to make that decision, declaring immediately before the penalty phase that "I trust and have faith in you, whatever your decision is." Second, Daniels consistently employed the same strategy throughout the trial. He contested no part of the prosecution's case and presented no argument, leaving the outcome in the hands of the judge. Before the penalty phase began, Daniels was again offered the services of counsel, either appointed or advisory, and an investigator, as well as additional time to prepare a penalty phase defense. He declined. Empaneling a jury for the penalty phase trial would have required that the bulk of the guilt phase evidence be presented again, undermining Daniels's desire to bring closure to the case and not further burden the victims and their surviving family members. As with the guilt phase, an advisement regarding the normative role of the jury in selecting penalty would not have made Daniels's waiver materially more informed in light of the strategy he employed.

It is always possible to elaborate on the extent of a right being waived. When asked if he waives his right to counsel, a defendant could be told that a lawyer must have a law degree, pass the bar examination, and take continuing

25

legal education courses. But such granular detail has never been required in order to support the conclusion that the waiver of counsel is properly made.

So too here. Regarding the right to a jury, a defendant could be told that the jury will be instructed on the law, will deliberate in private, can discuss the case with no one, receives no outside information, selects one of their group to act as foreperson, and can be polled before a verdict is recorded. My colleagues in the plurality select a few items from the menu of possibilities and would require that they be mentioned under penalty of verdicts being reversed 16 years after the fact. Settled precedent rejects such a rigid rule, and correctly so. Under the totality of the circumstances and based on a clear and extensive record, I would find that Daniels entered a knowing and intelligent waiver of his right to a jury trial on the issues of guilt, special circumstances, and penalty.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**

**CONCURRING AND DISSENTING OPINION BY KRUGER, J.
TO THE LEAD OPINION, CONCURRING IN THE JUDGMENT
OF THE COURT**

This case illustrates the difficulties that can arise on appeal when a trial court fails to "advise a defendant of the basic mechanics of a jury trial in a waiver colloquy" or to take other "steps as appropriate to ensure, on the record, that the defendant comprehends what the jury right entails." (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 169 (*Sivongxxay*).) Under the unusual circumstances of this case, my preference would be to order further proceedings to allow the parties to make a more robust record concerning the intelligence of defendant David Scott Daniels's jury waiver. (Cf. *Lopez v. United States* (D.C. 1992) 615 A.2d 1140, 1147–1148 [limited remand for further proceedings to determine whether waiver was knowing and intelligent]; *Jackson v. Com.* (Ky. 2003) 113 S.W.3d 128, 136 [similar]; *State v. Anderson* (2002) 249 Wis.2d 586, 603 [similar]; *State v. Aragon* (1997) 123 N.M. 803, 809 [similar]; *Com. v. DeGeorge* (1984) 506 Pa. 445, 450 [similar]; also cf. *People v. Lightsey* (2012) 54 Cal.4th 668, 702–710 [limited remand for retrospective competency hearing]; *People v. Leahy* (1994) 8 Cal.4th 587, 610 [limited remand for hearing regarding admissibility of expert evidence].) "If I were to insist upon the disposition I prefer, however, there would be no judgment of this court . . . ." (*People v. Harris* (1984) 36 Cal.3d 36, 72 (conc. opn. of Grodin, J.).) To avoid that outcome, I concur in the judgment set out in our *per curiam* opinion, which resolves the case in the manner that most closely reflects

my own views on what the record before us establishes about the intelligence of defendant's jury trial waiver. (See *ibid.*; see also *Screws v. United States* (1945) 325 U.S. 91, 134 (conc. opn. of Rutledge, J.).)

Although the trial court that accepted defendant's jury trial waiver painstakingly confirmed that defendant understood he was choosing to have the court make findings about his guilt, the truth of the special circumstances, and ultimately the penalty, the transcript nevertheless reveals an important omission: The court never asked defendant whether he understood the alternative before him — that is, the nature of the jury right he was waiving. The court itself supplied no information on the subject, nor did it confirm that defendant had received such information elsewhere — for example, from a written advisement (which defendant did not receive) or from counsel (which defendant, who was then self-represented, did not have). (Cf. *Sivongxxay*, *supra*, 3 Cal.5th at pp. 170, 169 [advising certain measures to "ensure that a particular defendant who purports to waive a jury trial does so knowingly and intelligently" and to "facilitate the resolution of a challenge to a jury waiver on appeal"].) The omission is particularly striking given the seriousness of the charges and the penalties defendant faced. (See *Patton v. United States* (1930) 281 U.S. 276, 313.)

Notwithstanding these deficiencies, I agree with Justice Corrigan that the record before us sufficiently demonstrates that defendant's choice to waive his right to jury trial on the charges related to special-circumstance murder was "made with eyes open." (*Adams v. U.S. ex rel. McCann* (1942) 317 U.S. 269, 279 (*Adams*).) My agreement on this point rests primarily on the indications in the record that defendant's overarching aim throughout the proceedings was simply to accept responsibility for the charged crimes. (See conc. & dis. opn. of Corrigan, J., *ante*, at pp. 17–18.) Defendant's manifest desire was to plead guilty (which, of course, would also have entailed waiving his right to jury trial). Once he was

2

prevented from doing so, defendant attempted to accept responsibility by the means that remained available to him. Consistent with that aim, he discharged his lawyer, declined to question prosecution witnesses, and presented no defense. As he told the probation officer, he " 'felt it would be unfair to the victims and their surviving family members for him to attempt to fight these charges, knowing he was guilty of each of the crimes.' " (*Id.* at p. 10.) His choice to waive his right to jury trial on the substantive charges was of a piece with his general approach to the trial on guilt that he did not want in the first place.[1]

The high court has made clear, at least in similar contexts, that the information a defendant must possess to make an intelligent waiver can vary from case to case. (See *Iowa v. Tovar* (2004) 541 U.S. 77, 92 (*Tovar*), quoting *Johnson v. Zerbst* (1938) 304 U.S. 458, 464 ["In prescribing scripted admonitions and holding them necessary in every guilty plea instance, . . . the Iowa high court overlooked our observations that the information a defendant must have to waive counsel intelligently will 'depend, in each case, upon the particular facts and circumstances surrounding that case.' "].)

Here, too, whether particular information bears on the intelligence of a jury waiver must depend, at least in part, on the goal that the waiver is intended to serve. Unlike most jury waivers, defendant's waiver as to guilt and special circumstances was plainly not made with an eye to "self-protect[ion]," or to secure any litigation "advantages." (*Adams*, *supra*, 317 U.S. at p. 278.) As such, while an express advisement about the fundamental attributes of jury trial might have made even clearer to defendant the protection that a jury might afford, there is

---

[1] This appeal, it should be noted, comes to us on automatic appeal: An appeal from a judgment of death is taken automatically and may not be waived by the defendant. (See *People v. Massie* (1998) 19 Cal.4th 550, 566–568.)

3

every indication that he did not want that protection at his trial on the substantive charges — and that additional advisements on that point, if anything, would have simply reinforced his resolve to waive a jury trial.  Our examination of "the totality of the circumstances" (*Sivongxxay*, *supra*, 3 Cal.5th at p. 167) cannot ignore this one.

The record provides no comparable indication with respect to defendant's penalty phase waiver, however.  Although the record clearly reflects defendant's desire to accept legal responsibility for his crimes by pleading guilty, the record does not reflect that defendant affirmatively sought the penalty he received.  True, defendant did not put on his own case in mitigation.  But when the People rested at the penalty phase, defendant asked the court for a few days to use the law library.  When proceedings resumed, defendant apologized to the families of Carolina and McCoy, admitting his crimes against the deceased and expressing "deep remorse and sadness."  (Conc. & dis. opn. of Cuéllar, J., at p. 9.)  Based on this record, it is unclear what defendant hoped to achieve at the penalty phase.  I therefore cannot conclude that information about the fundamental attributes of a jury trial would have been irrelevant to, or merely confirmatory of, defendant's choice to waive a penalty phase jury.  Nor do I think it clear, on this record, that defendant already understood these attributes.  The penalty phase of a capital trial is "the only context in which California law authorizes a jury to decide the appropriate punishment for a criminal offense."  (*Sivongxxay*, *supra*, 3 Cal.5th at p. 213 (conc. & dis. opn. of Liu, J.).)  None of the decade-old advisements defendant received in connection with earlier criminal cases touched on the characteristics of a penalty phase jury (cf. *ibid.*), and there is little reason to think that those characteristics would be " 'obvious to an accused' " (conc. & dis. opn. of Corrigan, J., at p. 12,

4

quoting *Tovar*, *supra*, 541 U.S. at p. 90).  I accordingly agree with the lead opinion that defendant's penalty phase waiver cannot be affirmed on this record.[2]

If the People opt to retry him, defendant may again choose to waive a penalty phase jury.  That choice is his to make.  But the choice, to be valid, must be a knowing and intelligent one.  The record before us does not reflect that defendant's penalty phase waiver was such a choice.  For these reasons, I concur in the judgment set out in the *per curiam* opinion.

**KRUGER, J.**

---

[2]    Separate and apart from federal constitutional requirements (see *People v. Robertson* (1989) 48 Cal.3d 18, 36), state law requires that the penalty be determined by a jury in the absence of a valid waiver (see *ibid.*; Pen. Code, § 190.4, subd. (b)).  The failure to secure a valid waiver constitutes an independent violation of state law.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Daniels

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S095868
**Date Filed:** August 31, 2017

_____

**Court:** Superior
**County:** Sacramento
**Judge:** James L. Long

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Gail R. Weinheimer, Kate LaGrande Chatfield and Gary D. Garcia, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Stephanie A. Mitchell, Sean M. McCoy, Larenda R. Delaini and Christopher J. Rench, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gary D. Garcia
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

Christopher J. Rench
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5374